Davis, Judge,
delivered the opinion of the court:
This is a dispute over the price term of an unusual supply contract. In 1950, as part of the federal stockpile program, the United States desired to acquire and store cobalt metal. Plaintiff is a Canadian smelting company which has been, off and on for many years, a producer of this metal from the ore or concentrate. A French Moroccan corporation (Societe Miniere de Bou-Azzer & du Graara — called SMAG for short) had substantial deposits of cobalt ores in French Morocco. After considerable negotiation between the French and United States Governments, SMAG and plaintiff (Deloro), agreement was reached upon a project — later formalized in a contract signed in October 1950 by the plaintiff, defendant, and SMAG- — under which SMAG ores and (concentrates in Morocco were to be shipped to Deloro’s smelter in Ontario and refined there, with the resulting metal to be delivered to the defendant for stockpiling in the United States. SMAG was to forward the raw materials according to a specified schedule, with final delivery to Deloro to be on or before November 1,1952. Plaintiff, in turn, was to make scheduled deliveries to the defendant, with the full quantity of metal to be delivered not later than June 30,1953.
*492 The price the Government was to pay for the cobalt metal was composed of two elements: (a) a payment to SMA.G of French francs in an amount equivalent to one-half of the dollar price of the cobalt concentrates; and (b) a payment to plaintiff of a dollar sum for each pound of cobalt metal[1] An escalation clause provided that, after a certain date, the latter payment was to be a fixed percentage of the domestic United States market price quotation for cobalt, published in the Engineering and. Mining Journal “as of the date of delivery of the cobalt metal” to the defendant. There was also to be an adjustment in the price by the use of the foreign exchange rate of Canadian for United States dollars current “at the date of delivery.” Over the life of the agreement, the cobalt market quotation increased in four steps, from $1.80, to $2.10, to $2.40, to $2.60; the Canadian dollar increased from below parity to above parity.
SMA.G made timely delivery of the cobalt concentrates, but plaintiff, for various reasons attributable to its own difficulties and its managerial election to favor its own economic interests at the expense of this contract with the Government (without, however, any bad faith or speculative purpose), failed to comply with its delivery schedule set forth in the contract, even as extended by the provisions for taking-account of excusable delay. Defendant knew, of course, of these failures, but it did not terminate further performance of the contract (as it had a right to do) because it felt that Deloro was the only producer able to supply the necessary stockpile metal without interfering with current supplies to American industry, and without an excessively costly program of reshipment of the concentrates back to the Eastern Hemisphere.[2] In addition, the defendant felt that it had a commitment to the French Government to have the cobalt metal enter the United States stockpile by June 30,1953 (the final contract delivery date), or as soon thereafter as possible.
*493 For the shipments prior to February 1954, defendant’s accomiting and financial personnel paid plaintiff at prices computed by using the cobalt market price quotation and the exchange rate on the daite delivery was actually made, not the date on which delivery was due. In February 1954 defendant began to insist that the computations had to be made as of the date of the scheduled delivery, rather than the delayed dates of actual delivery. Since prices so calculated were, in the main, higher on the dates of actual delivery, defendant deducted sums from current invoices to make up for the asserted over-payments in the past. In April 1954 Deloro (which had contested the defendant’s theory) refused to make any further deliveries because of these disallowances, and informed defendant that it would not resume performance until payment of the $100,628.32 it believed owing for past deliveries, as well as a binding agreement by defendant to pay for future shipments on the basis of the actual delivery date.
When plaintiff thus ceased performance under this contract, it had delivered 1,303,925 pounds of cobalt metal, and 194,088 pounds were left to be delivered. Some 2,151,660 pounds of SMAG cobalt concentrates were in plaintiff’s hands awaiting treatment. Further negotiations ensued, but there was no settlement of the dispute. In March 1956 the Comptroller General, following his own earlier decisions, ruled that Deloro had no right to increase the cost of Government supplies by its own failure or refusal to deliver by the promised time. Both parties stood their ground. Late in 1956, Deloro took over the remaining cobalt for its own account. The Government brought suit in a Canadian court and plaintiff has sued here.
The commanding issue for us, as it has been for the parties since 1954, is the meaning to be assigned to the phrase “as of [or “at”] the date of delivery of the cobalt metal” in the price escalation and exchange-rate adjustment clauses of the contract. Is this the date of actual delivery, even though delivery was delayed by the plaintiff without justifiable excuse under the contract ? Or is it the date on which delivery was *494 due under the contract delivery schedule? Around this question the whole dispute revolves.[3]
This is another case (see W. H. Edwards Engineering Corp. v. United States, ante, p. 322) in which the evidence of the parties’ sub j ective intention is of little assistance. The critical issue was not broached until 1954 and there is no adequate showing of what the parties consciously thought about the point, if it was in mind at all, prior to that time. In this connection, we attribute little significance to the course of payments by defendant (in 1951, 1952, and 1953) using the date of actual delivery for the cobalt market price quotation or for the dollar rate of exchange.[4] These payments were made, more or less routinely, by fiscal and accounting employees who had no procedures for determining whether the shipments were late and did not concern themselves with that problem. The defendant’s contracting officers were wholly unaware of the basis of the payments, of plaintiff’s filing of amended invoices (see footnote 4), or of the existence of any issue between the parties as to the proper method of calculation. If the Government officials whose actions are cited as revealing the defendant’s own construction of a contract are not significantly tied to the administration of contract performance, their conduct is meaningless as an aid to contract interpretation. When the canon of construction speaks of giving weight to the “parties’ ” own interpretation, it refers, so far as the Government is concerned, to a responsible officer assigned the function of overseeing the essentials of contract performance — not to any federal employee or officer whose work happens to be connected with the contract. Agency fiscal or finance offices are not ordinarily a significant part of the process of negotiating and performing contracts. Cf. United States v. Holpuch Co., 328 U.S. 234, 240-41 *495 (1946). The auditors’ payments on which plaintiff relies do not, therefore, advance its cause.[5]
Nor are we helped in this case by the institutional history which often clarifies the meaning of a standard Government contract or clause. In its pertinent articles, this was not a standard-form agreement but an ad hoc arrangement negotiated by the parties for a special situation. The record contains no enlightening information on comparable escalation or adjustment provisions. We cannot charge the defendant with any ambiguities since plaintiff appears to have initially proposed the terms which are now disputed; but there was also considerable negotiation and the plaintiff does not seem to be so much the author that it should bear, on that account, the brunt of uncertainties.
The only guide left to us is the traditional principle that the contract words must be interpreted as they would probably be understood by reasonable men standing in the parties’ shoes. The plaintiff says that reasonable men, reading the words “as of the date of delivery”, would naturally take the contract to mean that the price would vary with the date of actual delivery; if the defendant did not wish to pay that price for a delayed shipment, it could terminate the agreement (under the clause authorizing cancellation for breaches) and sue for damages, if any; but the defendant could not accept delayed deliveries (as defendant did) and insist on paying at the rate which would have been applicable if the shipments had been made on time.
This may be one parsing of the contract, but to us it does not seem a sensible reading of the words “date of delivery” *496 in this particular agreement. At the time the arrangement was made, all the signs looked toward payment at the price current on the date of due delivery and pointed away from the possibility of late deliveries. Prompt delivery was undoubtedly important to the defendant. The statutory authority to receive cobalt was due to expire on June 30,1953, and the procurement officials believed that quick delivery was essential. The contract reflected this urgency by incorporating a schedule of shipments and providing expressly that “the full quantity of cobalt metal required to be delivered by Deloro to E.P.S. [the defendant] under this contract shall be delivered not later than June 30, 1953.” The parties thought, as our findings show, that Deloro would surely be able to meet this schedule; there was no expectation of failure. At the same time, the parties affirmatively anticipated that the price of cobalt would rise in response to the Korean hostilities. The role of the escalation and adjustment clauses was to take account of such increases which might occur prior to a particular delivery date fixed in the contract. These price-change provisions were plainly meant to be intertwined with the due dates for delivery — expected by both sides to become the actual dates of delivery. It is wholly reasonable to link the neutral phrase “as of the date of delivery”, in the escalation and adjustment clauses, directly to the contract schedule. The “plain words” can easily carry that construction without creaking.
The obvious vice of plaintiff’s interpretation, on the other hand, is that it would permit the contractor to reap a financial benefit from its own unexcused delay. The defendant would have to pay more because (and not simply in spite) of plaintiff’s breach, and the plaintiff would gain because of its default. Since prices were expected to rise, this would have been the only likely result of a clause requiring escalation and currency adjustments to be figured as of a delayed delivery. There was little probability of the defendant’s receiving a reduced price through delay. Accordingly, there would be a malevolent incentive, if plaintiff were right, for the contractor deliberately to postpone performance in order to increase its recovery. This contractor acted in good faith, we have found, but the defendant can hardly be thought to *497 have thrust its head into the lion’s month in the hope that the animal would turn out to be a vegetarian. Cf. Padbloc Company, Inc. v. United States, ante, pp. 369, 377. Nor would the power to cancel the contract for lateness, or the dubious privilege of being able to sue for damages, compensate for such indulgence to the contractor. Cancellation would leave the stockpile -unsatisfied and frustrate the goal of procuring the required tons of cobalt as soon as possible. A potential claim for damages is likewise an unsatisfactory substitute; it is tantamount to pinning all one’s hopes on the two birds still in the bush.
Standing where the negotiators stood in 1950 and studying the language they used, the objective observer would have to conclude, we think, that this contract did not provide for escalation for deliveries which were unexcusedly late. The defendant would not have accepted such a requirement and the plaintiff would not have asked it to agree. “Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.” The Kronprinzessin Cecilie, 244 U.S. 12, 24 (1917); see also Phillips Petroleum Co. v. Gable, 128 F. 2d 943, 944-45 (C.A. 10, 1942).
Plaintiff envisages hypothetical difficulties if “date of delivery” is given the meaning “date of due delivery”, rather than “date of actual delivery.” What if, plaintiff says, the contractor anticipated the due date; would the due date still govern ? We see no great problem, under this contract, in consistently applying the due date — whether the shipment be on time, early, or delayed — and no unfairness to either party. That is the price the defendant expected and agreed to pay, and which plaintiff expected and agreed to receive. It imposes no penalty on plaintiff which would obtain the agreed price whether or not the market (or the exchange rate) rose or fell after the due date.
But since we hold that the contract fixed the price as of the due date, we cannot accept defendant’s latest position that it would be entitled to a lower price if that prevailed at the time of late delivery. The parties’ agreement did not so stipulate, and there is no reason to imply an exception in this case any more than in the ordinary instance in which *498 a price is fixed (without escalation) for an item scheduled to be furnished at a certain time but where at the moment of late delivery the market price happens to have fallen or the contractor’s costs of performance decreased; the defendant might prove and recover damages for the delay but the price term of the contract would not be altered. Nor can we agree that the adjustment clause relating to dollar exchange requires that calculation to be made as of the date of actual delivery. Both clauses — the price escalation and the currency adjustment provisions — contain the same phrase (“date of delivery”) and they must be read alike. It would be somewhat advantageous to defendant, because of the currency fluctuations, to construe the adjustment clause as referring to actual delivery, but that happenstance cannot modify the contract.
Using the due date as the proper measure, the parties are agreed that plaintiff has already been paid more than enough. It cannot recover and its petition must be dismissed.
Defendant has interposed a counterclaim demanding judgment against plaintiff for two elements of damage: (a) the overpayments made by defendant for the cobalt metal delivered by plaintiff, and (b) the value of the one-half interest of the United States in the remaining cobalt concentrates (purchased jointly by plaintiff and defendant from SMAGr) which plaintiff converted to its own use and did not refine into metal for delivery under this contract. The parties have stipulated that, if the defendant’s interpretation of the contract as to the proper date for price computation is correct, plaintiff has been overpaid $20,829.34. Defendant is entitled to recover this sum as part of its counterclaim.
When plaintiff improperly refused (in April 1954) to make any more deliveries under the contract, it had on hand sufficient cobalt concentrates received from SMAGr to process 194,088 pounds of cobalt metal. For this concentrate the United States had paid SMAG, in franc counterpart funds, the equivalent of $129,356.51, as the Government’s share of the price of the materials. In using these concentrates for its own purposes, plaintiff consumed materials belonging to the defendant to this extent. By rejecting plaintiff’s theory of the current price, we also necessarily hold that plaintiff *499 had inadequate legal justification for refusing to make further deliveries of cobalt metal to defendant and for diverting these cobalt concentrates to its own private uses. Plaintiff does not deny that, in these circumstances, the United States is entitled to judgment for the $129,356.51 it paid for the concentrates. This portion of the counterclaim is also recoverable.
Plaintiff is not entitled to recover and its petition is dismissed. Judgment is entered for the defendant, on its counterclaim, in the sum of $150,185.85.
FINDINGS OF FAOT
The court-, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Deloro Smelting and Defining Company, Limited (Deloro), is a Canadian corporation with executive offices in Ottawa, Canada. Its smelting plant is located in Deloro (near Marmora), about 145 miles southwest of Ottawa. This suit is brought for damages arising out of an alleged breach of a contract to refine French Moroccan cobalt concentrates and to deliver the resulting cobalt metal to the defendant’s stockpiles. The total amount claimed by the petition is $214,607.24 which amount was reduced in the course of the proceeding to $168,683.06. Defendant denies that it breached the contract and has counterclaimed for $129,356.51, representing defendant’s one-half interest in French Moroccan cobalt concentrates delivered to Deloro for processing into cobalt metal. Defendant further claims that it overpaid Deloro under the contract the sum of $20,829.34. Deloro’s standing to bring this suit as an alien is not questioned by defendant, since under the laws of Canada a citizen of the United States has a reciprocal right to prosecute claims against the Government of Canada in the Canadian courts.
2= Deloro is a subsidiary of M. J. O’Brien, Ltd., a closely-held family corporation, which for a long period of time has engaged in extensive mining operations in Canada and elsewhere. It organized Deloro in 1907 as a smelting company to treat arsenic type silver ores mined in northern Ontario. In treating these ores, Deloro in 1914 succeeded in *500 isolating cobalt therefrom on a commercial scale, and from that time until 1925 Deloro was the world’s major producer of cobalt. At that time, cobalt was not considered a strategic metal and was used as an oxide, mostly in chemical processes and to impart a brilliant blue color to ceramics, pottery, glass, china, and the like. When it was discovered that cobalt was a useful metal in alloys, Deloro in 1920 set up a separate alloy manufacturing branch. During the 1920’s the demand for silver and cobalt was rather slight, and Deloro ceased smelting operations for a couple of years. In general, Deloro’s history as a smelter has been, in the words of its president, “rather up and down” because of fluctuating demand for silver and cobalt. Its operations had nearly come to a halt when its future as a cobalt smelter became brighter as a result of contractual negotiations in 1950 with defendant, as hereinafter related. By this time, and at all times involved herein, cobalt had become a strategic metal, partly because of its increasing use as an alloying element in the hardening of steel. It was and is used in metals subjected to intense heat, such as the blades behind the explosive chambers in jet engines and high-speed steel cutting tools. It was and is likewise used in electro and permanent magnets, stainless steel products, and other special-purpose, high-temperature alloys.
3. Deloro’s nearly exclusive position in the commercial production of cobalt came to an end in 1925 when a large Belgian mining enterprise, Union Miniere du Haut-Katanga (Katanga), obtained cobalt in large quantities from non-arsenic copper ores produced by Katanga in the Belgian Congo. Since that time, except for an interruption during World War II, Katanga has been the world’s dominant and leading producer of cobalt. At its various plants, Katanga was capable of producing cobalt from both arsenic and non-arsenic ores using, in the case of the former, the original process developed by Deloro. Although by 1950 Deloro’s cobalt production was no larger than 10 percent of the world’s output, nonetheless, it was during the time here involved the only established smelter in the entire Western Hemisphere capable of performing the difficult process of *501 extracting cobalt metal from arsenic ores of the type produced in northern Ontario and French Morocco.[6]
4. Because of its value as a strategic metal, and because no significant amount was being produced from any ores originating in the United States, its territories, or possessions, cobalt metal was desired by the United States for its strategic metals stockpile during all times involved herein. In 1950, pursuant to the authority contained in the Strategic and Critical Materials Stockpiling Act of 1946,[7] the Federal Supply Service (FSS) in the Treasury Department, later the Emergency Procurement Service (EPS) in General Services Administration (GSA) was authorized to acquire cobalt metal (but not cobalt ores or concentrates) for the United States stockpile.
Also, the Economic Cooperation Act of 1948,[8] among other things, directed the Administrator of the Economic Cooperation Administration (ECA) to assist in projects designed to procure materials required by the United States as a result of deficiencies in its own natural resources. Under that Act the United States and France had entered into a so-called Economic Cooperation Agreement reading in pertinent part as follows:
ARTICLE IV
* * * *
2. The Government of France will establish a special account in the Bank of France in the name of the Credit *502 National ((hereinafter called the Special Account) and will make deposits in francs to this account as follows:
(a) The unencumbered balance at the close of business on the day of the signature of this Agreement in the Special Account in the Bank of France in the name of the Credit National established pursuant to the Agreement between the Government of the United States of America and the Government of France made on January 2,1948 and any further sums which may, from time to time, be required by such Agreement to be deposited in the Special Account. * * *
(b) The unencumbered balances of the deposits made by the Government of France pursuant to the exchange of notes between the two Governments dated April 22, 1948.
(c) Amounts commensurate with the indicated dollar cost to the Government of the United States of America of commodities, services and technical information (including any costs of processing, storing, transportation, repairing or other services incident thereto) made available to France on a grant basis by any means authorized under the Economic Cooperation Act of 1948, less, however, the amount of the deposits made pursuant to the exchange of notes referred to in subparagraph (b). * * *
4. Five percent of each deposit made pursuant to this Article in respect of assistance furnished under authority of the Foreign Aid Appropriation Act, 1949, shall be allocated to the use of the Government of the United States of America for its expenditures in France, and sums made available pursuant to paragraph. 8 of this Article shall first be charged to the amounts allocated under tins paragraph.
ARTICLE V
1. The Government of France will facilitate the transfer to the United States of America, for stockpiling or other purposes, of materials originating in France which are required by the United States of America as a result of deficiencies or potential deficiencies in its own resources, upon such reasonable terms of sale, exchange, barter or otherwise, and in such quantities, and for such period of time, as may be agreed to between the Governments of the United States of America and France, after due regard for the reasonable requirements of France for domestic use and commercial export of such materials. * * *
*503 5. A French Moroccan corporation known as Societe Mi-niere de Bou-Azzer & du Graara (SMAG) was the owner of substantial deposits of arsenic cobalt ores located in French Morocco. SMAG was a subsidiary of another French Moroccan corporation known as Omnium Nord Africain (ONA).
On April 19, 1950, an agent of ONA wrote a letter to the FSS offering to furnish the United States stockpile ores containing 11 percent cobalt at a rate of 50 tons a month over a three-year term. The then Chief of the FSS Purchase Division, H. C. Maull, Jr., (hereinafter sometimes called the “Contracting Officer”) replied to the effect that FSS had no authority to purchase cobalt ores but would be interested in any proposal whereby it might acquire cobalt metal. Shortly thereafter, ONA’s agent contacted Deloro through its managing director, Alan Scott, for the purpose of exploring the possibility of Deloro treating the Moroccan ores at its plant. During this early stage of negotiations, Deloro’s management understood that Deloro was being asked merely to quote its treatment charges for converting the Moroccan ores to cobalt metal for the United States stockpile with no obligation in any way to market the finished metal. On April 29, 1950, Mr. Scott wrote ONA’s agent setting forth a proposal by Deloro to treat 100 metric tons per month of Moroccan ore with a cobalt content of 11 percent to 13 percent over a period of 2 years. Deloro’s proposal guaranteed a recovery of 87 percent of the cobalt contained in the ores received and agreed that the cobalt would equal or better the requirements of United States stockpile specifications; it further stated that Deloro would retain all other recoverable metals but would pay for the gold content on a stated formula; it proposed shipping, weighing, sampling, and inspection provisions, and stipulated that Deloro should have no obligation to market the finished product. The treatment charge proposed by Deloro was $1.06 net per pound of cobalt metal returned. In June, Deloro’s president, Brian A. O’Brien, informally reduced the $1.06 quotation to $0.90. On June 20, 1950, Mr. Scott wrote ONA’s agent advising that Deloro had treated Moroccan ores in 1948 without *504 difficulty, they being very similar to northern Ontario ores, and that Deloro’s cobalt metal “more than meets the F.S.S. specifications of the U.S. stockpiling authorities.” Mr. Scott’s letter was forwarded to ECA on June 23, 1950.
6. Meanwhile, in the spring of 1950, ECA had initiated a project under Article V of the above Economic Cooperation Agreement to supply the United States stockpile with cobalt metal from French Moroccan cobalt ores. Since it was not empowered to use dollars for the purchase of cobalt ores, ECA intended to buy them with counterpart francs in the special account described in Article IV of the Economic Cooperation Agreement, supra. The French, however, determined to require that payment for the ores be made 50 percent in dollars and 50 percent in counterpart francs. Deloro, which originally had contemplated being a mere converter of the ores, was informed of this development, and agreed to consider becoming a party to the transaction on a part-purchase basis by itself paying to ONA in U.S. dollars one-half the price of the ore. On July 26, 1950, ONA submitted an offer to ECA as follows:
ONA will contract with ECA to deliver cobalt concentrate CIF Quebec, Canada. Contract to cover 200 metric tons of materials per month for three years. ONA will be reimbursed one-half in counterpart funds under contract with ECA, one-half in dollars under contract with smelter as follows: ECA contract with ONA will provide for payment in counterpart francs of the equivalent of 97 V2 cents per kilo of cobalt contained in concentrates. Deloro Smelting and Refining Co., Ltd., will pick up concentrate Quebec, refine at its plant Mar-mora, deliver metal to FSS, FOB Buffalo, New York, and guarantee 87 percent recovery cobalt metal. Upon delivery of cobalt metal to FSS, FSS under contract with Deloro will pay Deloro a price for metal which will include about 52 cents per pound of metal delivered to be returned to ONA in U.S. dollars in U.S.A., for account ONA as dollar portion of payment to ONA. ECA will not take responsibility for precious metals or for dollar return. Both these matters to be arranged by contract between ONA and Deloro.
7. In early August 1950, ONA’s agent made representations, which came to Mr. Scott’s attention, that the French *505 and United States Governments bad tentatively agreed upon a project to authorize[9] the shipment of 7,200 metric tons of cobalt ores from Morocco for the U.S. stockpile, the operation to be effected by deliveries scheduled to June 30, 1953, at the latest, and the ores to be paid for 50 percent in dollars and 50 percent in U.S. controlled counterpart francs. Mr. Scott was further informed that this project contemplated the conclusion of a contract between ECA and ONA incorporating the above terms and further providing specifications, prices, and conditions of delivery.[10] He also knew that the price would be a premium one in excess of the market price.
8. A few days later, negotiation conferences were begun in Washington, D.C., between representatives of Deloro, ONA, FSS, and ECA.[11] The parties to these negotiations knew that FSS had no authority to purchase cobalt ore or to contract for deliveries of cobalt metal beyond June 30, 1953. They knew also that treatment by Deloro of the French Moroccan cobalt ore would require an expansion and renovation of the Deloro smelting plant to more than double its then capacity of 15 tons per month of cobalt in all forms.[12] By reason of a prior visit to Deloro’s plant, FSS representatives were acquainted in general with Deloro’s operations and the condition of its plant, and ECA and FSS were desirous that Deloro enlarge its cobalt ore treatment capacity in the interest of Western Hemisphere defense. With the assistance of their attorney, on August 8,1950, Deloro’s rep *506 resentatives drafted and submitted to EGA a proposal reading as follows:
SALE ON COBALT TO TT.S. STOCKPILE
The French Government has authorized the shipment of 7,200 metric tons of Omnium Nord Africain (ONA) cobalt ore to the United States and payment therefor, one-half in counterpart francs, providing the cobalt metal obtained from the ore goes into the U.S. stockpile.
To take advantage of this authorization, it is here proposed that the Deloro Smelting and Befining Company, Ltd., Canada, contract with ONA to purchase the 7,200 metric tons of ore and that the U.S. Government contract with Deloro to purchase from Deloro the cobalt metal obtained from the ore.
This memorandum sets forth briefly the principal obligations in such contracts.
(1) Deloro will agree with ONA to pay for the ore upon its delivery and analysis at Quebec, a price GIF Quebec, of $1.95 per kilo of cobalt contained in the ore. This price will be paid by Deloro one-half (97.5 cents) in'U.S. dollars in New York City, and one-half (97.5 cents) in French francs in Paris. For the conversion of dollars into francs, the rate of exchange will be determined at the date of each payment in accordance with the French Government agreement.
(2) The Government will agree with Deloro to pay Deloro for cobalt metal delivered FOB Buffalo, New York, a price which will consist of (a) an advance to Deloro of the francs necessary for Deloro’s purchase of the ore, and (b) $1.517 per pound of cobalt metal to be paid in U.S. dollars in New York City at the time the metal is delivered at Buffalo, meeting Government specifications.
(3) ONA will agree with Deloro to deliver to it 7,200 metric tons of ore and to complete its total deliveries on or before May 1,1953, and to maintain a rate of delivery of at least 200 metric tons per month commencing from July 1, 1950, the first shipment to be delivered no later than November 1,1950, and to contain not less than 1,000 metric tons.
(4) Deloro will agree with the Government to deliver to it- 87% of the cobalt contained in each shipment of ore — the exact amount of such delivery of metal to the Government to be determined, and guaranteed by Deloro, at the time that the Government advances the francs for each said shipment of ore. Deloro will agree to *507 complete its total deliveries of metal not later than June 30, 1953.
(5) To allow for fluctuations in the market.price of cobalt over the period of these contracts, both contracts will contain price escalation provisions tied to the E.M. J. cobalt market price quotation, to-wit: that, after April 1951, in the event of any increase in. the market price quotation above $1.85 per pound, the total price (dollars and francs) to be paid by Deloro to ONA for ore will be computed as of the date of delivery of the ore at 49.25% [47.89%] of the then current E.M.J. market quotation for cobalt, and the price in U.S. Dollars to be paid by the Government for the metal will be computed as of the date of delivery of the metal at 84.44% [81.41%] of the then current E.M.J. market quotation for cobalt. . •
(6) The contract between Deloro and ONA will have standard provisions for weighing, sampling, and determining the humidity of the ore, the .expense of which will be borne one-half by ONA and one-half by Deloro, and also will contain a standard provision for the return to ONA of .precious metals..
The proposal also contained a cost breakdown.per pound which was revised at conferences held August 8 and 9 as follows:
COST IN tr.s. DOLLARS
Cost of ore delivered at Quebec y2 Price paid ONA-1_ . 447
Metallurgical loss_ . 067 . 514
Deloro treatment charge_ . . 900
Deloro financing charge-- • . 020[13]
Deloro charge for Canada inland freight- . 063
1.497 '
COST IN COUNTERPART FRANCS
Cost of ore delivered at Quebec y2 Price paid ONA_^___.447 . v
Metallurgical loss---' . 067 . 514
2.011
*508 ,9. Negotiations between the parties continued. One important area of discussion was the price escalation clause proposed by Deloro. In view of the Korean hostilities, all parties expected the price of cobalt to rise. At all times involved, the principal supply of cobalt for the United States was obtained from the treatment of ores originating in the Belgian Congo and bearing primarily copper. The United States market price for cobalt was largely determined by the price at which cobalt obtained from Belgian Congo ores was offered for sale by Katanga in the New York metal market. This New York metal market price for cobalt has been regularly published in the Engineering and Mining Journal (EMJ) and as of the times here in issue, was quoted therein as follows:
Price From— To— per pound,
April 1,1949_December 31, 1950_$1. 80
January 1, 1951-September 30,1951- 2.10
October 1,1951_October 31,1953- 2.40
November 1,1953_November 30,1956- 2. 60
December 1,1956-January 31, 1957- 2. 35
February 1, 1957-February 1,1959- 2.00
February 2, 1959_February 25, 1959- 1.75
At the time of the contract negotiations, the EMJ quotation for cobalt metal was $1.80 per pound. Deloro’s price quotation of $2.011 per pound, supra, exceeded the EMJ quotation by approximately 11 percent, and the price escalation clause of the contract (quoted below in finding 14) was worked out on a basis that would insure a continuation of nearly the same excess over the EMJ quotation during the delivery period.
During the conferences it does not appear that either party anticipated or discussed any problem of late deliveries by Deloro. Deloro’s representatives had no doubt, and expressed none, as to Deloro’s ability to perform according to any agreed upon schedule, and Government representatives had no reason to suspect otherwise. Deloro fully understood that the contract under negotiation would require complete delivery of the metal by not later than June 30,1953. When the question of scheduling deliveries arose during the conferences, it was agreed that Deloro would develop a delivery schedule and present it by a revised proposal.
*509 10. As a result of these negotiations, Deloro drafted a revised proposal dated August 11, 1950, and transmitted it to FSS in the form of a “Contractor’s Offer.” The offer contemplated two proposed contracts, one a contract between Deloro and defendant for the sale of cobalt metal to the United States, the other a contract between Deloro and ONA for the purchase by Deloro of ONA cobalt concentrates.[14] In relevant part Deloro’s offer read as follows:
Confirming negotiations, the undersigned offers to furnish refined cobalt metal to the Government of the United States of America in the quantities and on the terms specified herein.
*****
4. Schedule of Deliveries: Deliveries will be made at least every thirty (30) days except that the first delivery will be made not more than 120 days after arrival of the first shipment of concentrate in Canada and in no event later than March 1,1951. Each delivery will be in an amount not less than 40,000 pounds and the full amount of cobalt metal required to be delivered under this offer shall be delivered not later than June 30, 1953. It will be understood that the above schedule of deliveries and the above quantities of cobalt metal are both contingent upon the performance by Omnium Nord Africain of its deliveries of concentrate in accordance with the Deloro Purchase Contract.
sf: # * * ❖
6. Price: The price to be paid for the metal will consist of
(a) An advance to the contractor of French francs in an amount equivalent to 44.7 cents per pound of cobalt contained in the concentrate, the said sum being required by the contractor for its purchase of the cobalt concentrate in accordance with the terms of the Deloro Purchase Contract, and
(b) $1.497 per pound of cobalt metal to be paid to the contractor in U.S. dollars in New York City.
For the conversion of dollars into francs, on the date of each payment of French francs in advance under *510 paragraph 6(a) above, the rate of exchange will be determined -under the provisions of clause (c) of Paragraph 2 of Article IY of the Economic Cooperation Agreement 'between the United States of America and France of June 28,1948, as amended.
* % * iH #
9. Price Escalator Clause: After April 1, 1951, in the event that the market price quotation for cobalt metal is above $1.85 per pound or below $1.75 per pound, the francs to be advanced by the Government to Deloro as required by paragraph 6 (a) above will be computed as of the date of the arrival of the concentrate at a Canadian port at one-half of 48.32 per cent of the current E.M.J. market quotation for cobalt, and the dollar price required to be paid under paragraph 6 (b) above will be computed as of the date of delivery of the cobalt metal to the Government at 80.92 per cent of the then current E.M.J. market quotation for cobalt.
í|; V
13. Time of Delivery: The materials, supplies or services described in the contract shall be delivered within the time provided for in the schedule of deliveries.
* * * * *
• 18. Force Majeure: (a) Except as hereinafter provided in subparagraph (b) of this article, in the event the contractor refuses or fails to make deliveries of material conforming to the specifications as defined in the contract within the time specified or any extension thereof, or to perform faithfully any conditions of the contract, the Contracting Officer, without prejudice to other rights resulting from breach of the contract conditions, may, by written notice, terminate the right of the contractor to proceed with any or all remaining deliveries under the contract.
11. On the same date of the aforesaid offer, i.e., August 11,1950, C. H. Burgess, Director of the Strategic Materials Division, ECÁ, wrote Mr. Maull of FSS as follows:
Enclosed herewith are the original and one copy of a revised offer dated August 11,1950, of Deloro Smelting and Refining Company, Ltd., Canada (Deloro) to sell to the United States cobalt metal in an amount equal to 87% of the cobalt contained in concentrates to be delivered to Deloro from French North Africa by Omnium Nord Africain (ONA) pursuant to a purchase contract between Deloro and ONA, copies of a draft of which are also enclosed. The offering price to the U.S. Govern *511 ment aggregates $2,011 per pound of cobalt metal delivered to the Federal Supply Service F.O.B. Buffalo, payable (a) by advance of the French franc equivalent of $.514 per pound of cobalt delivered (expresed in the contract as $.441 per pound of cobalt contained in the concentrate) from the ECA 5% counterpart fund on delivery of concentrates to Deloro, and (b) the $1.497 balance payable by FSS in U.S. dollars on delivery of. the cobalt metal in Buffalo.
We should like to observe that any acceptance of the offer by FSS must be conditioned upon (a) receipt of approval of the French Government and the ECA Mission to France, which has been requested; and (b) _ the execution of a formal contract, containing provisions complying with ECA requirements, particularly specification of the method of advancing 5% francs provided in paragraphs 6 (a) and 7 of the offer.
Representatives of Deloro and ONA met August 9 and 10, 1950 with representatives of FSS and ECA. The latter agreed that the only problem presented by the proposal which requires a policy decision is the fact that the aggregate price to the U.S. government is $2.011 per pound, 20.1$ (or about 10%) higher than the current EMJ quotation of $1.80 per pound for cobalt metal. The escalation provision in paragraph 9 insures that approximately this differential over the EMJ price will be maintained during the delivery period which expires on June 30,1953. For your convenience we are attaching an analysis of the cost breakdown submitted by the contractor.
ECA strongly recommends that the offer be accepted. In making the decision whether to accept this offer above the current EMJ quotation, FSS will undoubtedly be primarily interested in weighing the stockpile’s need for cobalt against the price, the possible effect on the future market price of cobalt, and its long term estimate of the cobalt market. However, we should like to point out that: (a) the offering price is lower than the current European market price for cobalt metal (which, we are informed, is between the equivalent of $2.17 and $2.20) ; (b) the principal factor in the differential from the current EMJ quotation is the high cost to Deloro of the concentrates purchased from ONA (which is able to maintain a firm price because of the European market) ; and (c) acceptance of the offering price may not greatly affect the EMJ quotations because about one-quarter of such price is payable in French francs rather than U.S. dollars.
*512 Since the St. Lawrence freezes about November 1 and ONA will be unable to ship concentrates to Canada after that date, it is requested that the FSS decision be promptly made.
12. On August 22,1950, the Deputy Commissioner of FSS wrote the Munitions Board,[15] transmitting Deloro’s offer, summarizing its major provisions, and concluding:
In view of the limited supply of cobalt metal and the currently existing stockpile objectives, together with the cost to the Federal Supply Service in U.S. dollars, acceptance of the attached offer is recommended.
Under date of August 30,1950, the Chairman of the Munitions Board replied to the Deputy Commissioner that he concurred in the FSS recommendation and stated:
While it is recognized that the total cost to the government is approximately 11% above the current price, it is equally noted that the actual cost to the stockpile is approximately 17% below the current price. This approval is given therefore in consideration of the government’s investment in counterpart funds as well as the stringent position of cobalt in the National stockpile.
13. On August 31, 1950, FSS and ECA wrote a joint letter to Deloro accepting its offer under specified conditions, as follows:
This refers to your offer dated August 11, 1950, to cobalt metal to the United States of America.
This will advise you that the United States of America hereby accepts your offer and proposes to reduce the terms of your offer to a mutually satisfactory contractual arrangement in which Omnium Nord Africain will be joined as a party.
The proposal to join Omnium Nord Africain as a party to this arrangement is made at the request of the French Government. Since the French Government has also requested an opportunity to review the final arrangement, this acceptance of your offer by the U.S. Government is necessarily subject to the French Government’s approval.
Immediately upon receipt of this conditional acceptance, Deloro proceeded with a program of plant expansion. Rep *513 resentatives of both parties also proceeded with a negotiation of a mutually satisfactory contract in the belief that there remained no unresolved questions of substance.[16] Their combined efforts resulted in the preparation of the formal contract document to which was assigned the designation “Contract GS-00P-98 (SCM-ECA).” Hereafter, it will be referred to simply as Contract 98. It was executed by the parties as of October 9,1950.[17]
14. Contract 98 contained three parts. Part One dealt with the purchase by Deloro of 1,200 metric tons of the cobalt concentrate from SMAG; Part Two dealt with the purchase of cobalt metal from Deloro by the defendant; and Part Three contained general provisions applicable to both Parts One and Two. The contract in its entirety is in evidence as plaintiff’s Exhibit 1 and is incorporated herein by reference. Most of its provisions are also reproduced as Appendix A to the petition.
The provisions of Contract 98 which have particular relevance to the present dispute are as follows:

*514
Article 1.7 Shipments of Concéntrate.

SMAG shall deliver shipments of concentrate to Deloro in Canada according to the following schedule:

Arrivals on or before Metric Tons

November 1,1950_1, 800
June 1,1951_— 1> 200
November 1,1951_1,400
June 1, 1952_1,400
November 1, 1952_1,400
% if! iff #

Article 2.4 Schedule of Deliveries.

(a) Deloro shall make deliveries of cobalt metal to EPS at least every thirty (30) days except that the first delivery shall be made not more than one hundred and twenty (120) days after delivery by SMAG to Deloro of the first shipment of cobalt concentrate under Part One of this Contract. Each delivery of cobalt metal hereunder shall be in an amount not less than forty thousand (40,000) pounds and the full quantity of cobalt metal required to be delivered by Deloro to EPS under this Contract shall be delivered not later than June 30, 1953.
(b) It is understood that the schedule of deliveries set forth in paragraph (a) above is contingent upon performance by SMAG of the schedule of deliveries in Canada of concentrate as set forth in Article 1.7 of this Contract, and that Deloro shall be under no obligation to deliver cobalt metal to EPS hereunder in any quantity greater than eighty-seven (87) per cent of cobalt contained in the concentrate received by Deloro from SMAG hereunder.

Article 2.6 Delivery.

Deloro shall ship the cobalt metal to be delivered hereunder from Canada to the United States by rail and shall deliver the cobalt metal hereunder FOB, EPS Warehouse, Buffalo, New York, in accordance with specific shipping instructions issued by EPS. At least ten (10) days’ advance notice of anticipated availability of cobalt metal for shipment shall be furnished to Chief, Storage and Transportation Division, EPS, Washington 25, D.C.

Article 2.6 Price of Cobalt Metal.

(a) The price to be paid by the Government for the cobalt metal will consist of:
1. Payment by ECA to SMAG of French francs in an amount equivalent to one-half (%) the United. States *515 dollar price of tbe concentrate in accordance with, the terms of Part One of this Contract;
2. Payment by EPS to Deloro in United States dollars in New York City of one dollar and forty-nine and seven tenths cents ($1.497) per pound of cobalt metal.
(b) After April 1,1951, in the event that the domestic United States market price quotation for cobalt metal published in the Engineering and Mining Journal is above one dollar and eighty-five cents ($1.85) per pound or below one dollar and seventy-five cents ($1.75) per pound, the payment by EPS to Deloro of United States dollars under subparagraph 2 of paragraph (a) above shall be computed as of the date of delivery of the cobalt metal to EPS at eighty and ninety-two ■ hundredths (80.92) per cent of the then current Engineering and Mining Journal market quotation for cobalt.

Article ¡2.7 Time of Payment to Deloro.

EPS shall make payment to Deloro of the amount required by subparagraph 2 of paragraph (a) of Article 2.6 hereof within ten (10) calendar days after acceptance by EPS of any cobalt metal delivered hereunder.
& íJí ❖

Article H.14 Change in Oanadiam, Bate of Exchange for United States Dollars.

(a) If at the date of any delivery of cobalt metal hereunder the current rate of exchange of Canadian dollars for United States dollars shall be other than the rate of 90.91 cents United States currency being equal to one Canadian dollar, the price per pound * * * shall be the dollar price per pound payable to Deloro under Article 2.6 of this contract, adjusted as follows:
Stef One — From the said dollar price per pound * * * deduct one-half the United States dollar price per pound of the concentrate applicable to the most recent shipment of concentrate by SMAG hereunder.
Stef Two — Convert the resulting United States dollar amount into Canadian dollars using the exchange rate of * * * 90.91 cents * * *
Stef Three — Convert the resulting Canadian dollar amount to United States dollars using the current rate of exchange of Canadian dollars for United States dollars as of the date of delivery of the cobalt metal.
Stef Four — To the resulting United States dollar amount add the United States dollar amount deducted in Step One above. This total is the adjusted price per pound.
(b) If at the date of any delivery of cobalt metal hereunder, the current rate of exchange of Canadian *516 dollars for United States dollars shall place the Canadian dollar at a parity with, or above the value of, the United States dollar, any adjustment to be made for such date under paragraph (a) of this Article shall be computed on the ‘basis of one Canadian dollar * * * being equal to one United States dollar, * * *
(c) For the purpose of this Article 2.14, the term “current rate of exchange of Canadian dollars for United States dollars” shall mean the official rate of exchange, if any, established by the Canadian Government and prevailing at the date of the delivery of cobalt metal, or if there be no such official rate then prevailing, the final daily quotation published in the New York Times on the New York foreign exchange market for the date of delivery of cobalt metal or for the most recent preceding date for which a daily quotation was published in the New York Times.
‡ $ $ $ $

Article 3.1 Force Majewre.

(a) Except as hereinafter provided in subparagraph (b) of this article, in the event SMAG and/or Deloro refuses or fails to make deliveries of material conforming to the specifications as defined in this Contract within the time specified or any extension thereof as provided in paragraph (b) following, or as may be agreed by all parties hereto, or to perform faithfully any conditions of this Contract, the Government, without prejudice to other rights resulting from breach of the contract conditions, may, by written notice, terminate the right of SMAG and/or Deloro to proceed with any or all remaining deliveries under the Contract.
(b) With respect to performance by either SMAG or Deloro, in the event of any strike, lockout, difference of workmen, accident, fire, explosion, floods, mobilization, war (whether declared or undeclared) act of any belligerent in any such war, riot, rebellion of any government, whether legal or otherwise; the elements, power shortages, or any other cause beyond the reasonable control of SMAG or Deloro, as the case may be, whether or not of the nature or character hereinbefore specifically enumerated, performance under the contract shall be suspended in whole or part until such cause ceases to exist and thereafter the time for fulfillment of the contract shall be extended by the length of time during which such cause prevented performance under the contract; provided, however, that any suspension of performance pursuant to this clause shall not exceed ninety *517 (90) days unless otherwise agreed upon, in writing, by the Government.
$ $ $ $ ‡
(c) Unless SMAG or Deloro, as the case may be, shall furnish the Government with written notice of the nature and extent of any force majeure condition referred to in paragraph (b) hereof which is claimed to exist, within a reasonable time after the commencement thereof, the terms, and conditions, of said paragraph (b) shall not become operative with respect thereto.
15. So far as the record discloses, none of the parties to Contract 98 appears to have expected that either SMAG or Deloro might fail to meet the delivery schedules set forth in Articles 1.7 and 2.4, respectively. No express provision, either by way of liquidated damages or otherwise, was written into the contract dealing specifically with the effect on other contract provisions of a failure to comply with the delivery schedules. As will be detailed below, the unexpected happened. Although SMAG substantially complied with its delivery schedule for the cobalt concentrates as set forth in Article 1.7, Deloro failed to comply with its delivery schedule for the cobalt metal as set forth in Article 2.4. While admitting its failure in this regard, Deloro contends that it is entitled under Article 2.6 to be paid the escalated price computed as of the actual date of delivery without reference to its timeliness under Article 2.4. The defendant responds that Deloro’s contention stems from a failure to read the contract as a whole and that to accept it would be to reward a contractor for an admitted breach of contract. Accordingly, defendant contends that any escalated price payable on a late delivery must be computed as of the due date for such delivery.
16. In preparing to perform under Contract 98, Deloro initiated a program of substantial renovation and expansion of its plant in late 1950. The major item in this program was the complete demolition of an old wooden smelter building and the construction in its place of a new steel building. Deloro’s expectation that it would receive delivery of steel for this new construction by March 1951 was too optimistic. Due to shortages attributable, at least in part, to the Korean War, the steel was not delivered until the fall of 1951, and *518 this delayed Deloro’s expansion program many months.[18] The delay in construction of the building resulted in a delay in the installation therein of new or renovated equipment, such as the blast furnace, new roasters, a new iron and copper removal circuit, and machinery for a new sulphating process. None of these delays were attributable to defendant. In the meantime, Deloro was producing relatively small amounts of cobalt metal with existing but limited facilities. Deloro had planned its expansion program for a production capacity of at least 30 tons of cobalt metal per month by mid-1951. Actually, it did not reach that goal until about April 1952.
17. Realizing that it would not be able to meet the first delivery date required by the contract, on February 13,1951, Deloro requested an extension, as follows:
Under the terms and conditions of the above contract, the first delivery of cobalt metal by Deloro should be made on or before March 10th, 1951, which is one hundred and twenty (120) days after delivery by SMAG of the first shipment of cobalt concentrate (see Article 2.4). I regret to advise that there will be an unavoidable delay of thirty days in meeting this first delivery date. The progress of plant construction and rehabilitation at Deloro has been impeded by delayed delivery of materials and equipment from our suppliers. Every effort has been made to complete our facilities in time to meet the first shipment date but this has not proven to be possible.
We would appreciate your formal assurance, therefore, that a postponement of the first delivery date for a maximum of thirty days, that is, to April 10th, 1951, will be recognized. The progress of development in our production facilities is such that we do not foresee any delay in making shipment over and above the thirty-day period requested. I would like to add also that this delay in the initial shipment will not mean an equal extension in time of completion of the total contract.
Article 2.6(b) provides for an increase in the price to be paid by the Government after April 1st, 1951, in the event of an increase in the market quotation for cobalt metal such as has now taken place. In view of *519 the above request for extension, we now propose, and will accept, that the shipment of the first 40,000 lbs. of cobalt metal by Deloro shall be priced in the same manner as if delivery had been made prior to April 1st, 1951.
On February 28, 1951, the Contracting Officer wrote to Deloro acknowledging receipt of the above letter and stating:
In view of the circumstances your request for a postponement of the first delivery date for a maximum of thirty days to April 10, 1951, is granted with the understanding that this delay in the initial shipment will not mean an equal extension in time of completion of the total contract, and that the shipment of the first 40,000 pounds of cobalt metal by Deloro shall be priced in the same manner as if delivery had been made prior to April 1,1951.
18. At no time during the contract period did Deloro comply with the delivery schedule set forth in Article 2.4 of Contract 98. Deloro was not even able to meet the first delivery date as extended by the Contracting Officer to April 10, 1951. (Finding 17, supra) The first delivery was made by Deloro on May 11,1951, by a shipment containing 36,300 pounds of cobalt metal in two lots. Lot No. 1 comprising 23,100 pounds, was Katanga metal not refined by Deloro; Lot No. 2, comprising 13,200 pounds, was metal refined by Deloro but from ores other than French Moroccan. The remainder of the 40,000 pounds due on the first shipment was not delivered until June 15, 1951. The entire 40,000 pounds were accepted by EPS for payment on various dates. Deloro invoiced the shipments with prices computed as though all shipments had been made on the original due date, March 10, 1951, using the contract rate applicable to deliveries prior to April 1, 1951 of $1.85 per pound ($1.497 per pound adjusted for the United States-Canadian dollar exchange rate on March 10, 1951). Meanwhile, the EMJ quotation for cobalt metal had increased to $2.10 per pound. For its next shipments in June, July, August, and September, Deloro billed defendant using computations based on the $2.10 EMJ quotation and on the United States-Canadian dollar exchange rate on the day shipment was made. The *520 shipments were accepted and paid for by EPS, as billed, without objection.
19. The EMJ quotation again increased on October 1,1951, to $2.40. Deloro made shipments totaling 142,500 pounds of metal from November 8, 1951 through February 26, 1952 (Lots 7 through 13), all of which deliveries, except for about 9,200 pounds, were due prior to October 1, 1951, when the EMJ quotation was $2.10. Deloro continued to invoice these shipments (including the 9,200 pounds) under price computations reflecting the EMJ quotation before October 1 of $2.10. However, in making the rate of exchange computations under Article 2.14, Deloro used the United States-Canadian dollar exchange rate in effect on the day shipment was made.[19] All these shipments were likewise accepted and paid for by EPS, as billed, without objection.
Although Article 2.7 of the contract provided for payment by the defendant within 10 days after acceptance of any delivery, payment was not always made by defendant within the 10-day period. In an effort to expedite the payments, Deloro sent telegrams and letters to defendant and later asked its Washington attorney, Mr. David Cobb, to hand-deliver invoices to EPS. Also, since the price computation provided under the contract was a complicated one, in April 1952, Deloro adopted a policy of accompanying each invoice with a price computation sheet.[20] On this price computation sheet Deloro showed the date used by it in determining the EMJ quotation and the United States-Canadian dollar exchange rate. The sheet then proceeded with a step-by-step explanation of the method used to obtain the per pound price on the invoice to which it was attached. The price computation sheet did not show the due date of the particular shipment, nor did it make any reference to Article 2.4 of the contract dealing with the delivery schedule. From April 1952, *521 throughout the remainder of Deloro’s deliveries this price computation sheet was attached to each invoice.
20. In early April 1952, Mr. Scott visited Deloro’s plant for the purpose of conferring with Deloro’s General Manager, Mr. Walsh, and the Secretary-Treasurer, Mr. Lang-ford. During this visit Mr. Langford asked Mr. Scott whether any change in Contract 98 pricing procedures was indicated by the fact that the Canadian dollar had reached parity with the United States dollar. In discussing the matter, Mr. Scott reviewed the previous invoices, and he was disturbed to note that Langford had based his price calculations on invoices for Lots 7 through 13, (referred to in the preceding finding) using what Mr. Scott believed to be the correct exchange rate but an erroneous EM J quotation. This matter was reported to Deloro’s president, Mr. O’Brien, who thereupon directed the preparation of amended invoices for these shipments, which he transmitted to Mr. Cobb in Washington by letter dated April 15, 1952, reading as follows:
The other day we had our Accounting Department look into the matter of payments from the U.S. Government to ourselves, under Contract GS-00P-98 (SCM-ECA), in order to ensure that the terms of the agreement were being complied with since the Canadian dollar has reached par with the U.S. dollar.
While we found this feature of our transactions in order, it came to light that we had not invoiced the U.S. Government correctly for four shipments of metal, comprising lots 7 and 8 on November 6th, lots 9 and 10 on December 4th, lot 11 on December 31st, 1951 and lots 12 and 13 on February 19th, 1952. The irregularity disclosed was simply that, inadvertently, our Accounting Department at Deloro had not brought these four shipments under the terms of the escalator clause of our contract — Article 2.6(b). Therefore, I requested corrected invoices, which are attached hereto, covering the above-noted shipments.
I thought it would save a lot of confusion if the matter were handled in this way, that is, sending you the invoices direct, as you may be able to explain to the appropriate party in five minutes what the problem is rather than our having to write several letters to Washington.
*522 Tbe amended invoices bad price computation sheets attached which showed that they were computed under the $2.40 EMJ quotation in effect on the dates the shipments were made. No reference was made in the amended invoices, nor on the computation sheets attached, to the fact that the shipments in Lots 7 through 13 were delinquent under Article 2.4 of Contract 98. On April 17, 1952, Mr. Cobb advised Mr. O’Brien by letter that he had discussed the matter of the amended invoices with personnel in the Comptroller’s Office of EPS, and that he did not anticipate any difficulty in obtaining payment of the additional amounts, provided that a complete explanation was submitted showing how the prices were calculated on both original and amended invoices. Thereafter, on May 9, 1952, Mr. Cobb wrote a letter to EPS, to the attention of a Mr. Grochawsky, in which he stated that he was transmitting therewith the aforesaid amended invoices and copies of the original invoices, all with price computation sheets attached.[21] Under date of May 29, 1952, the Comptroller’s Office of GSA paid Deloro the increased amounts claimed on the aforesaid amended invoices, totaling $35,775.79.
21. It was the procedure at GSA for an audit to be made of all invoices (prior to payment) in the Examination Branch, Accounts and Beports Division, Office of the Comptroller. The first step in such audit was to send the invoices to the Inspection Division for certification as to whether delivery of the invoiced items had been made. Then they were turned over to a clerical employee, known as an “examiner”, for a mathematical check and examination as to *523 whether payment of the invoices would be in accordance with the terms of the contract, copy of which was available to the examiner. If the examiner was in doubt as to the correctness of any invoice, he was required to consult his supervisor; if not, he would initial the invoice and forward it for payment certification by an authorized certifying officer. In reliance on the examiner’s approval, the certifying officer would certify the invoice for payment, after which it was paid.
At the times involved herein, the authorized certifying officers in the Examination Branch were Mr. C. F. Grochaw-sky (now deceased) and his assistant, Mrs. J. B. Boston. Mrs. Boston certified the amended invoices on Lots 7-13 on May 19, 1952, and they were paid 10 days later. Although she had no specific recollection of these amended invoices, she believed they would have been processed for payment in the manner described above'. So far as she could recall, the Examination Branch had no established procedure for determining whether a particular delivery under examination for payment was a late delivery or had been made on the due date required by the contract.
At the time the amended invoices were processed and paid, the present question as to the proper interpretation of the escalation provisions of Contract 98 had not yet become the subject of dispute between the parties. The Government official most closely connected with Contract 98 was Mr. Joseph W. Creekmore, who as Purchasing Officer of the Metals Section, Purchasing Division, was assigned by the Contracting Officer to the administration of Contract 98. No representative of Deloro or of the GSA Examination Branch brought the amended invoices to Mr. Creekmore’s attention,[22] and he did not learn of them until long after the dispute arose herein. Mr. P. K. Alford, an attorney in the GSA Legal Division, was frequently consulted by Mr. Grochawsky of the Examination Branch with respect to matters involving contracts for the purchase of metals. At *524 the time of the processing of the amended invoices, he had had very little to do with Contract 98, but was in active negotiation with Deloro representatives regarding other prospective cobalt processing contracts. Like Mr. Creek-more, he had never heard of the amended invoices until long after the dispute arose herein. In his opinion, the amended invoices should have “raised a red flag” causing the Examination Branch to refer them to either the Contracting Officer or the Legal Division. If they had been so referred, he felt the present dispute would have been avoided. So far as he was aware, it was standard administrative procedure in GSA to pay an escalated price only on timely deliveries. However, from this record, it does not appear that, at the time of processing the amended invoices, such standard administrative procedure was the subject of general knowledge within the Examination Branch. At least, it had not established any control system for the enforcement of any such procedure.
22. During the seven month period, April through October of 1952, Deloro shipped to EPS a total of 242,825 pounds of cobalt metal which were inspected, accepted, and paid for by EPS. The total was comprised of six[23] shipments designated as Lots 14 through 19. While the pounds in each shipment varied, the average for the period was a little less than 35,000 pounds per monith as contrasted with the contract requirement of 40,000 pounds per month. Like previous shipments, Lots 14 through 19 were all late under the delivery schedule. Deloro invoiced the shipments, using prices computed as of the date of shipment. For these shipments, the EMJ quotation was the same on both due dates and shipment dates. However, except for the last two shipments in this group, the United States-Canadian dollar exchange rate differed on the two dates. EPS paid these invoices without change.
In late September 1952, Deloro advised EPS that its employees had threatened to strike. A plantwide strike occurred on October 3, 1952, and lasted until October 31, 1952. Deloro’s plant was not back to normal operation until No *525 vember 14, 1952. On October 6, 1952, Deloro invoked the Force Majeure provisions contained in Article 3.1 of Contract 98, and EPS granted an extension thereunder of six weeks, thus extending the completion date from June 30, 1953 to August 11,1953.
This was the only time Deloro invoked the Force Majeure article of the Contract. Also, following the extension of February 23, 1951, sufra, and until May 8, 1953, (see finding 28, infra), Deloro never requested any other waiver or extension of time within which to make its deliveries of cobalt metal.
23. Deloro’s cobalt delivery problems were not confined to Contract 98. On April 16,1951, Deloro had contracted with the Canadian Government to supply it with cobalt metal from Canadian ores. Since that contract had no specific delivery schedule, Deloro did not expect it to interfere with performance under Contract 98. However, by letter dated April 25, 1951, the Canadian Department of Defense Production instructed Deloro to reserve such part of its productive capacity as was required to supply “essential Canadian needs.” On May 10,1951, Mr. Scott sent a copy of that letter to EPS and stated:
A complete renovation leading to an expansion of smelter and refinery facilities at Deloro was undertaken late in 1950 when our contract for the treatment of Moroccan cobalt ores was concluded. The delays we are experiencing on steel and equipment deliveries make it obvious that we cannot resume full-scale operations before August, 1951. In the interim period we are maintaining cobalt production at the utmost possible rate but this is not always sufficient to keep up with essential Canadian requirements plus the metal deliveries required under the above contract. As a measure of this stringency, we delivered 36,300 pounds of cobalt metal to your warehouse in April in contrast to the 40,000 pounds called for. We will have to contend with reduced output until our blast furnace facilities are restored in August. Until that time it will be impossible to guarantee complete fulfilment of our delivery schedule in the face of the directive we have received that essential Canadian demands should have first call on our productive capacity.
*526 The temporary modification of deliveries that we require is of a general rather than a specific nature as we propose to continue shipments to your warehouse in the maximum amount possible each month. In our estimation, these deliveries will be in the order of 75% or better of the contract amounts until September, 1951, and thereafter will be in excess of the contract monthly amounts. We do not foresee any necessity to extend the ultimate date of completion of the contract.
He went on to request a modification of the iron content specification for the cobalt metal being produced under Contract 98 on the general ground that the specification maximum of 0.30 percent was not customary except as to Belgian Congo metal, and that a relaxation of the specification to a maximum of 0.50 percent iron content would aid Deloro’s “difficult supply position,” without materially affecting the intended uses for the metal. However, in answer to an inquiry by EPS as to whether such a change might result in savings justifying a reduction in the contract price, Mr. Scott replied that the small change would have no effect on deliveries of cobalt metal and would not lead to any savings. Nonetheless, the. change from 0.30 percent to 0.50 percent was acceptable to the Munitions Board, and GSA relaxed its inspection requirements accordingly, although Contract 98 was never formally amended in this regard.
24. Commencing, in the spring of 1951 and continuing through February of 1953, Deloro and EPS engaged from time to time in negotiations concerning cobalt treatment contracts additional to Contract 98. During this entire period, of course, both parties were well aware of Deloro’s delinquency in deliveries under Contract 98. However, defendant was then engaged in a “crash” program to acquire cobalt metal for its stockpile and to do it so far as possible without reliance upon, or interference with, the major current supplier of cobalt metal to United States industry, namely, Katanga. As the Government’s representative most familiar with the problem, Mr. Creekmore believed that Deloro was the only cobalt producer in the world, other than Katanga, able to produce the metal in stockpile quantities. Deloro?s representatives did nothing to discourage this belief. To the contrary, their letters to EPS continued to forecast *527 increasing capacity upon which were 'based proposals for additional cobalt processing contracts. Although these statements were made in good faith, they were too optimistic.[24]
The negotations referred to above resulted in the preparation of three additional cobalt processing contracts between Deloro and defendant. The first of these, known as Contract 2274, was executed by Deloro and defendant in October 1951. However, since it involved an extension of Contract 98 and the purchase of additional SMAG concentrates, it was necessary for ONA and SMAG to be made parties thereto. ONA and SMAG declined to enter into Contract 2274, and it therefore never became effective.
The second contract, known as Contract 2800, was executed by Deloro and EPS in April 1952, at a time when Deloro’s deliveries under Contract 98 were in substantial arrears. Under Contract 2800, Deloro undertook the processing to cobalt metal of nearly 4,000 tons of Canadian ores which were held in the United States stockpile and which defendant had theretofore tried to have processed in the United States without success. At Deloro’s suggestion, this contract provided for delivery to defendant of not less than 10 tons of metal monthly, commencing no later than 3 months after delivery of the ores to Deloro. From confident statements made by Deloro’s representatives, the defendant’s contract negotiators had no doubt as to Deloro’s ability to meet this delivery schedule. However, Deloro failed to do so. Contract 2800 also contained a price escalation provision but not with reference to the EMJ quotations. Instead, prices were to be increased or decreased by adjustments for fluctuations in the index of labor and material costs at Deloro’s plant *528 during stated periods. Provision was also made for adjustment of tbe amount payable by a conversion formula dealing with the United States-Canadian dollar exchange rate. Like Contract 98, this contract permitted termination by EPS for failure to meet the delivery schedule and contained no liquidated damages clause for late deliveries. Unlike Contract 98, however, the payment and dollar exchange rate articles of Contract 2800 incorporated by specific reference Article 6 which established the place of delivery and the delivery schedule.
The last of these contracts, known as Contract 3653, was executed February 27, 1953, at a time when Deloro was still substantially in arrears under Contract 98. Contract 3653 called for the processing by Deloro of approximately 49,148,000 pounds of cobalt concentrates to be acquired by defendant from northern Ontario and with approximately 4,177,580 pounds of returnable cobalt metal. Commencing on or before March 31, 1953, Deloro agreed under Contract 3653 to deliver EPS a minimum of 60,000 pounds of cobalt metal monthly and to complete deliveries not later than March 31,1957. Like Contract 2800, this contract contained a price escalation clause based on increases or decreases in Deloro’s labor or material costs, provided for termination on failure to meet the delivery schedule, and contained no liquidated damages clause. Unlike Contract 2800 (but like Contract 98), the delivery article of Contract 3653 was not incorporated by reference into its payment article.
25. Although at the time of negotiating the aforesaid additional contracts, defendant’s representatives were aware of Deloro’s delinquencies in deliveries under Contract 98, they continued to rely upon representations by Deloro regarding its increased capacity resulting from plant expansion. In the summer of 1952, the parties negotiated concerning the possibility of Deloro processing a large amount of additional SMAG concentrates, and in September 1952, Deloro made a firm offer for this business. This offer was followed up by a letter from Deloro to the Contracting Officer dated September 26, 1952, reading in pertinent part:
Deloro cannot make any very substantial modification in the terms offered in my September 24th letter. As I *529 indicated to you, Deloro is anxious to obtain these concentrates, and has cut its treatment charges to the very bone.
$ H: ‡ $
You recognize, I know, it has been your Government in particular that has been instrumental in the expansion of the Deloro plant to treat cobalt concentrates. In accordance with your Government’s request, Deloro is now in the final stages of plant expansion which, over the period of the last 18 months, has increased its capacity from 35 tons to 85 tons per month. You appreciate that this capacity is far beyond the maximum limit required for ores originating in Canada. This increased capacity was developed in anticipation that Deloro would treat French Moroccan concentrates. It is presently treating these concentrates under Contract GS-00P-98, and a year ago Deloro and the Government had reached agreement on an arrangement to extend Deloro’s processing of these concentrates over a further 3-year period. Also, it is to be borne in mind that the Deloro plant operates only on arsenical concentrates and that materials of this character are available only in Canada and French Morocco.
We are confident that an analysis of the offers you have received for treatment of these concentrates will show that the difference in the cost to the Government arises out of ocean transportation of the concentrates. When Deloro first undertook its plant expansion it was agreed that there were advantages in having an efficient cobalt treatment plant located on this continent. It was also agreed that for efficiency it would be necessary that the Deloro plant be provided with a continuous supply of ore. Presumably, in these agreements, the Government recognized the necessity for ocean transportation of Moroccan concentrates.
We respectfully request, therefore, that the Government give consideration to these conditions and to the strategic advantages that will be had (1) in the processing of these concentrates on this continent, and (2) in the use of Deloro’s recently expanded processing capacities.
He $ $ $ $
As a matter of fact, the processing contract which was the subject of these negotiations was awarded to a subsidiary of Katanga for processing in Belgium, and this was a source of great disappointment to Deloro. This development *530 caused Deloro to reexamine its expansion plans. However, prior to the execution of Contract 3653, the defendant was not aware of any possible revision of plans by Deloro.[25] In entering into Contract 3653, defendant’s contracting representatives relied on Deloro’s representation of September 26, 1952, that its plant capacity had increased to 85 tons of cobalt metal per month. They had calculated that with Contract 98 requiring 20 tons monthly, Contract 2800 requiring 10 tons monthly, the additional 30 tons required monthly under Contract 3653 would be well within Deloro’s represented capacity of 85 tons. Actually, during the times here involved, Deloro’s capacity never exceeded 65 tons.[26]
26. Shortly after recovering from the plantwide strike referred to above, Deloro resumed deliveries of cobalt metal to EPS. Except for January, deliveries to EPS were, made under Contract 98 [27] for each month in 1953, being Lots 22 through 32.[28] By mid-June 1953, Deloro’s deliveries under Contract 98 had begun to exceed 40,000 pounds per shipment. They never fell below that figure thereafter and were frequently quite considerably in excess thereof. The Deloro invoice for each delivery throughout 1953 was accompanied by the price computation sheet which showed that the invoice price was computed by using the EMJ quotation and exchange rate in effect on the date of shipment. For Lots 22 through 30 (February through October 1953) such price computation would be the same whether made as of the date of shipment or as of the date such delivery was due. However, on November 1, 1953, the EMJ quotation *531 increased from $2.40 to $2.60. Accordingly, on its November and December shipments, Deloro invoiced on the basis of the $2.60 quotation, although on the due date for such deliveries the EMJ quotation was $2.40. Nonetheless, all 1953 shipments were accepted by EPS and paid for at the price so computed by Deloro.
27. Prior to April 1953, EPS had not objected to the numerous Deloro deliveries of cobalt metal in amounts less than 40,000 pounds. However, on April 9, 1953, the Director of EPS Storage and Transportation Division requested Deloro’s explanation of “tenders not meeting the minimum weight requirements.” Deloro responded:
❖ ❖ ❖ ❖ *
It is quite true that shipments of cobalt metal have been made in amounts less than the minimum specified in Article 2.4(a) of the above-numbered contract. We do not feel that this will occur in the future but delays in the rehabilitation of our smelter works in the months past have frequently left us short of the expected minimum poundage at each month end. We have been under the impression that deliveries in any reasonable amount would be acceptable, and even desirable, in spite of the exact letter of the contract, and accordingly we have used our best judgment in delivering the maximum possible each month.
•5» »t» «}• *i*
28. Prior to May 8,1953, Deloro had not notified the Contracting Officer, or any of his assistants, that Deloro would be unable to complete deliveries under Contract 98 by the contract termination date' of June 30, 1953. However, in April 1953, the EPS Inspection Division notified Deloro that it had no authority to accept any deliveries after June 30, 1953. This advice caused Mr. Scott to write the Contracting Officer on May 8, 1953. In that letter, Mr. Scott summarized Deloro’s performance to date, showing that Deloro had shipped 647,725 pounds of cobalt metal under Contract 98 and tha,t a balance was due EPS of 850,287 pounds. He referred to the requirement of Article 2.4(a) requiring completion of deliveries by June 30,1953, advised that delays in the. rehabilitation of' Deloro’s smelter made it impossible to meet this obligation, and requestéd an amendment to the con *532 tract extending the date of final performance for 18 months, i.e., to December 31, 1954. He stated further:
For your information and guidance in this matter, we would advise that our original plans for expansion of output have not fully materialized, due to some disappointments in respect to supplemental contracts of which you are aware. These plans would have facilitated an earlier completion of contract GS-OOP-98 but it is not economically practical to carry out a full program of expansion merely for the purpose of speeding our deliveries under that contract. We can give confident assurances, however, that our monthly deliveries from this date will be not less than the minimum amount of 40,000 lbs. which will be in addition to our obligation to maintain deliveries of 20,000 lbs. cobalt metal under contract GS-00P-2800.
The record shows that Deloro was much slower than expected in rehabilitating its smelter, this being partly attributable to shortages of material and labor and partly attributable to its management’s uncertainty as to the extent of anticipated future business and future ore supplies. Other factors contributing to Deloro’s delay in deliveries under Contract 98 were its increased deliveries of cobalt metal and oxides to commercial users, including its own Stellite Division, and also deliveries under Contract 2800. In addition, due to greater demand for silver, Deloro was accepting and treating at this time increased quantities of silver ores from its commercial customers, which further contributed to production delays under Contract 98. Mr. Scott for Deloro freely admitted at the trial that the defendant had no responsibility for, and had nothing to do with Deloro’s difficulties in this regard, because they were matters either within the sole control of Deloro, or for which it bore sole responsibility. Also, at no time has Deloro contended that these delays were excusable under the Force Májeme clause, or any other provision, of Contract 98. The various decisions of Deloro’s management which resulted during 1951-53 in its devoting an average of only about 56 percent of its total cobalt deliveries to contracts with defendant were made deliberately and with knowledge that a failure to meet delivery schedules would likely ensue. Through over-optimism. Deloro had tried, in the vernacular, to swallow more than it *533 could chew. Faced with this dilemma of its own making, Deloro favored its own economic interests as a custom smelter by arranging its production and deliveries in a way which it hoped would keep both its commercial customers and defendant reasonably well satisfied. Coupled with the other delay factors mentioned above, these decisions resulted in Deloro’s breach of Article 2.4 of Contract 98. However, the record will not support a finding that these decisions by Deloro were made in bad faith or in an effort to speculate on a price rise in the EMJ quotation.
29. On June 22,1953, Mr. Scott wrote the Contracting Officer, reviewing Deloro’s existing cobalt metal production in relation to contract deliveries in order that EPS might have the information in considering Deloro’s request for an extension of time. He stated that Deloro’s production was 60 tons per month of which only 45 tons were of a quality meeting TJ.S. specifications. He pointed out that Deloro was presently delivering to EPS a monthly total of 30 tons of cobalt metal under Contracts 98 and 2800, and concluded as follows:
This leaves us with a balance of 15 tons to be divided between contract No. 3653 and any demand that may be made upon us for deliveries to the Canadian Government from the treatment of their stockpile of concentrates at our plant. The Canadian Government has made no request as yet for deliveries but we have an obligation to meet such request when it is made. Contract No. 3653 could receive the total amount of 15 tons per month but this will depend altogether upon your agreement to our proposal for extension of deliveries under contract No. 98 in an amount of 40,000 lbs. monthly until completed.
With further reference to contract No. 365'3, it is now realized that the quantity of concentrates involved will be less than anticipated when this contract was first drafted. Our expansion program has been adjusted accordingly and we will not have a capacity to deliver 30 tons of metal monthly against this contract, as originally proposed. We believe that best efficiency and costs can be achieved on the ores in sight by operating our plant at its present capacity. This will involve some delay in deliveries against contract No. 3653 until contract No. 98 is completed, but beyond that point will permit us to make a rapid gain on the stockpile of Canadian concentrates now held both for your account and for the account of the Canadian Government.
*534 On June 24,1953, EPS Commissioner A. J. Walsh rejected Deloro’s request for extension by a letter reading in pertinent part as follows:
This Service is unable, without adequate consideration, to grant such extension. Your reference to disappointments in not getting certain contracts to treat other stockpile concentrates is not understood since this Service gave your firm an equal opportunity to compete for all processing contracts.
Under the terms of this contract, there appears to be ample margin for a monetary consideration since your toll charges are tied to the E&MJ Metal and Mineral Markets quotation which by application of the appropriate percentages, equates to approximately $1.35 per pound of returnable metal, while under more recent contracts with this Service you are being paid $1.19 per pound plus actual increases in labor and material in-dices.
On June 30, 1953, Mr. Scott responded that Deloro was not in a position to offer a reduction in the price of delivered metal as a consideration for the requested extension, and explained his reasons in detail for believing that EPS was in error in its apparent impression that a material price difference existed between the three contracts in favor of Contract 98.
On July 13, 1953, the Contracting Officer (through Mr. Creekmore) advised the EPS Storage and Distribution Division as follows:
^ ‡ ^
As to Contract No. GS-OOP-98 (SCM-ECA) although our unwillingness to grant a requested extension beyond June 30, 1953, places this Contractor in default, you are nevertheless authorized to accept any delivery of refined cobalt metal which is tendered, provided all other contract requirements are met. While acquiring full delivery thereunder may be somewhat extended, the reason tor granting this authority is that the concentrates from which this metal is to be derived is in fact Government property which was purchased jointly by EPS and ECA under a rather unusual procedure.
Then, on July 28, Deloro asked EPS to advise whether it would accept for shipment 40,000 pounds of cobalt metal ready for shipment by Deloro against Contract 98. EPS *535 wired Deloro that the Inspection Division had been authorized to accept returnable cobalt, although delinquent, and that all tenders would be accepted subject to contract conditions of inspection and acceptance. Thereafter, all EPS shipping instructions to Deloro contained the notation “Late Delivery approved by Director”.
In August 1953, EPS proposed an amendment to Contract 98 to enable EPS to call upon Deloro to make delivery of cobalt metal thereunder at places other than the EPS Warehouse, Buffalo, New York, and to cause any consequent increase in transportation costs to be borne by EPS and any decrease therein to be credited by Deloro to EPS. This amendment to Contract 98 was accepted by Deloro on September 17, 1953, and by EPS on September 22, 1953.
On August 11, 1953, Mr. Scott wrote a lengthy letter to the Contracting Officer outlining the delivery situation under all three contracts insofar as Deloro was concerned. He referred to the “principal delinquency” under Contract 98 of 718,338 pounds which he again attributed entirely to the delay in smelter rehabilitation during 1951 and 1952. He also referred to a “small” delinquency under Contract 2800 which he thought could be corrected without difficulty. He did not consider Deloro to be substantially delinquent under Contract 3653 and stated:
‡ ‡
The amount of cobalt referred to in contract GS-00P-3653 is wholly unrealistic and we have had to take this into account in determining the point at which our expansion program must be halted. Our commitment to deliver 60,000 lbs. of cobalt metal monthly was undertaken in direct relation to the contemplated supply of approximately 4,000,000 lbs. of cobalt in concentrates in the contract period. In our view, there is reasonable assurance of not more than one-quarter to one-third of the stated quantity, and I believe you will agree that we should not be held to a high rate of delivery when the ore supply is drastically lower. * * * From Deloro’s point of view, we must work on realities and these indicate that the current rate of production is in reasonable balance with the existing and foreseeable supply of raw materials. It would be economically unsound to continue our expansion program beyond the present 60 tons monthly of cobalt in all forms until there is definite as *536 surance of an additional supply of raw materials. _ Increased production could only be achieved at additional cost to the ores in sight and would leave us with an over-expanded plant in a relatively short time.
At the time of the foregoing contract amendment, exchanges of correspondence, etc., there is nothing to indicate that the parties as yet realized the existence of a potential dispute between them regarding the proper date for computing the escalated price due on any delivery.
30. By no later than August 31, 1953, defendant was clearly entitled under Article 3.1(a), if it so desired, to terminate Contract 98 for default by Deloro in failing to meet the delivery schedule. Defendant did not then, or later, terminate the contract but continued to press for deliveries, even though delinquent. Mr. Creekmore, the EPS official charged with responsibility for administering Contract 98, did not institute termination action for three reasons: (1) defendant urgently needed the cobalt metal for its stockpile, (2) he felt defendant was committed in its agreement with France that the metal from the SMAG concentrates would enter the. United States stockpile by June 30,1953, and (3) he believed that defendant had a one-half interest in the SMAG concentrates at Deloro’s plant for which defendant had no use, as such, and that if Contract 98 were terminated, defendant had no alternative place to send its share of the concentrates for treatment.[29] However, being concerned over the progressive accumulation of untreated concentrates at Deloro, and being disturbed by Mr. Scott’s advice that Deloro’s “expansion program must be halted,” defendant partially terminated Deloro’s right to proceed with Contract 3653 on December 14, 1953. In so doing, EPS advised Deloro that it intended to negotiate *537 a processing contract covering future northern Ontario concentrates with a new Canadian smelter, and then stated:
At this time, however, this Service does not intend to exercise its right to terminate your right to proceed with the processing of those concentrates covered by contracts GS-OOP-98-(SCM-ECA) andGS-OOP-2800 (SCM), or those concentrated [sic] purchased by you as agent for the Canadian Department of Defense Production and are [sic] being processed under contract GS-OOP-3653 (SCM).
The Emergency Procurement Service desires to reiterate that it will look to your company for continued deliveries under the contracts for refined metal with respect to which your right to proceed has not been terminated. We trust, also, that this action of diverting the flow of a part of the concentrates deliverable will enable you to correct your delinquinces [sic] within the shortest possible time.
Mi\ Scott replied on December 18 stating that Deloro considered its letter of August 11 to be a realistic approach and that the EPS termination action was unwarranted. He reserved Deloro’s contractual rights but stated that deliveries would be continued at a rate which would conclude Contract 98 in May 1954 and Contract 3653 by midyear 1955.
31. Sometime after Mr. Scott’s letter, but before January 21,1954, Mr. Creekmore asked a Mr. G. A. Eoush of the EPS Inspection Branch to compile a schedule of deliveries under Contracts 98 and 2800. Mr. Eoush complied, and on January 21, 1954, he submitted a memorandum, with schedules of deliveries attached, and stated:
With this data available, the Accounts and Eeports Division can make certain that, when an invoice is received for any shipment, the price and cost items are those properly applying to the month in which the shipment was due, rather than to the month in which the shipment was actually made.
On January 27, 1954, the Contracting Officer, in a memorandum prepared by Mr. Creekmore, forwarded Mr. Eoush’s schedule to the EPS Accounts and Eeports Division and stated:
It is felt that the attached copy of this schedule will assist you in assuring that the Contractor is paid only *538 such, increased prices as existed when a particular delivery was actually due under the contract.
In early February 1954, Mr. Creekmore, Mr. Alford, and Mr. Grochawsky conferred on various occasions with Deloro’s attorney, Mr. Cobb. They advised Mr. Cobb that payment of Deloro’s invoice on Lot 33 was being delayed because they believed Deloro had overcharged on earlier invoices. They interpreted the provisions of Contract 98 (and of the other two contracts, as well) as precluding payment to Deloro of a price for a late delivery higher than the price which would have been paid if the delivery had been made on its due date. Mr. Cobb reported fully on these conferences to Deloro stating that he felt the EPS position was arrived at by reason of a “new ruling” from the General Accounting Office (GAO).[30] He advised of his disagreement therewith, and that, in his opinion, Deloro should take a “hard-boiled position” on this development and make no further deliveries on such terms. Mr. Creekmore and Mr. Alford stated that, during these and later conferences, Mr. Cobb made no mention of Deloro’s processing of the amended invoices as described in finding 20, sufra.
32. On February 15, 1954, the Chief of the Examination Branch, Accounts and Eeports Division, Office of the Comptroller, GSA, wrote a letter (prepared by Mr. Grochawsky) by which he advised Deloro that paid invoices on Lots 31 and 32 were being adjusted for overcharges of $56,957.84. As reason for this adjustment, the letter stated that an analysis had 'been made of all deliveries and payments, resulting in an attached tabulation reflecting the proper price that should have been paid. In effect, the letter concluded that the proper way to compute the escalated price was to use the EMJ quotation on the date delivery was due but to apply “the conversion rate to U.S. dollars as obtained from the New York Times on the dates that the shipments were received at destination.” As a result of these adjustments, GSA deducted $56,957.84 from Deloro’s invoice on Lot 33 *539 in the amount of $137,860.54 and paid Deloro the balance of $80,902.70.
• 33. Lot 33 had been delivered to EPS on January 27,1954. During February and March, Deloro delivered Lots 34, 35, 36,[31] and 37, invoicing each shipment on the basis of EMJ quotations and exchange rates in effect on the date of shipment. EPS recomputed the amounts using EMJ quotations in effect on the dates deliveries were due, issued disallowance statements on the resulting differences, and paid Deloro the reduced amounts on various dates in March and April. By letter dated April 15, 1954, Deloro advised EPS that it disagreed with the EPS interpretation of the price escalation provisions, that it considered the EPS action of price dis-allowances had excused Deloro from further deliveries, and that Deloro would not resume deliveries of cobalt metal under Contract 98 until (1) it had been paid $100,628.32 then due for past deliveries under the contract as Deloro interpreted it, and until (2) EPS had agreed to pay for future deliveries at prices computed as of date of delivery. The letter concluded:
Deloro is ready and willing to postpone the settlement of damage claims arising out of delinquencies of either party until after the contract work has been performed and payments made on the contract terms. However, so long as the Government persists in recovering its claims on its own terms before the contract work is paid for on the terms that were agreed upon, Deloro will be compelled to discontinue further performance.
Deloro made no further shipments of cobalt metal to EPS under Contract 98. At the date of the aforesaid letter, there remained to be treated by Deloro Contract 98 SMAG concentrates aggregating 2,151,660 pounds, and the balance of cobalt metal due to be processed therefrom and delivered under Contract 98 was 194,088 pounds. Appendix A at *540 tached hereto, and made a part hereof, shows in detail the delivery schedule per contract, the actual deliveries, the amounts paid, and the amounts payable computed as of both delivery dates and due dates.
34. The main stages in the smelting process at Deloro were (1) inspection and analysis of incoming ores, (2) crushing of lumpy ores followed by screening, (3) blast furnace smelting, eliminating slag and arsenic, (4) roasting, (5) sulphat-ing, (6) dissolving into solution, (7) removal by precipitation of iron and copper, (8) oxidation, (9) precipitation of cobalt from nickel, and (10) reduction to cobalt metal. This process constituted a continuous circuit, with different products being drawn off at different stages, and ending with the cobalt metal. The complete process required about 90 days.
Also, at all times here involved, Deloro continued its silver refining under contracts with silver producers in northern Ontario. During the above smelting process, silver ores were mainly drawn out just prior to stage (3) and were separately refined to marketable silver under an entirely different process.
While it is technically possible at the very beginning of the smelting process to separate various types of ores and concentrates so as to be able to trace the final product to the specific ores from which it was derived, this is an inefficient way to operate a smelter. In keeping with standard smelting procedures, Deloro did not separate its ores prior to feeding them into the smelter, but intermingled them to what its metallurgists considered an efficient mixture for the intended production of the various metals contained therein. The various ores lost their identity, as such. Therefore, Deloro’s accounting records maintained no precise controls over ores in process but were set up to reflect Deloro’s obligations for specific deliveries of metal only.[32]
35. In March 1954, when Deloro ceased deliveries under Contract 98, it made a large delivery under Contract 2800 amounting to 112,500 pounds, thereby not only correcting its existing default but considerably exceeding its then delivery *541 obligations under that contract. Thereafter, Deloro made deliveries to EPS of cobalt metal only under Contracts 2800 and 3658. Deloro substantially maintained its delivery schedule under Contract 2800 but concluded its deliveries thereunder in March 1955 with a small balance due of 2,983 pounds. It commenced delinquent deliveries under Contract 3653 in April 1954[33] and concluded its deliveries thereunder in October 1957 with a balance still due of 24,540 pounds.
36. Although Deloro was continuing monthly deliveries of cobalt metal in sizeable amounts under Contracts 2800 and 3653, both parties were desirous of resolving their dispute under Contract 98, if possible. A number of conferences were held during May and July 1954 in which were discussed possible procedures, such as a request for ruling by the Comptroller General or the institution of suit in the Court of Claims.
Nothing further was done in 1954. Negotiations were resumed in the spring of 1955, and it was decided that GSA would submit the dispute to the Comptroller General pending whose decision the position of the parties would remain unchanged. However, the Office of the General Counsel delayed the submission.
Whereupon, Deloro wrote the Contracting Officer on December 23, 1955, reiterating its position in the dispute and stating that, if EPS did not accede to Deloro’s position by the end of February 1956, Deloro would proceed to mitigate its damages by completing the contract processing work and selling the resulting metal on the commercial market. On February 3, 1956, GSA responded to Deloro’s letter of December 23, 1955, as follows:
This administration has submitted the question of default by Deloro Smelting & Defining Co. Limited on subject contract to the Comptroller General of the United States.
*542 Because of the statements contained in your letter of December 23, 1955, it is necessary to point out that the United States Government paid very substantial sums of money to SMAG for the cobalt ore under this contract. The Government has certain property rights to this material which cannot be modified by action on your part.
You are in a position of trust with respect to the property. Your proposal to sell it, unauthorized by the Government, will result in a breach of trust and will subject you to the penalties prescribed by law for such action.
On February 20, 1956, Deloro replied to the above letter restating its arguments in detail and stating in pertinent part:
Our records show that the United States has paid to SMAG for cobalt ore now in our yard and remaining to be processed under this contract a sum equivalent to $129,356.32, U.S. funds, this payment having been made to SMAG by the United States in French francs.
* * # * *
Due to your delay until 3rd February 1956 in replying to our letter of 23rd December 1955, Deloro’s plans for processing this remaining cobalt ore have been further delayed. Our present processing schedule anticipates disposal of this cobalt on the commercial market in amounts of approximately 20,000 pounds monthly, commencing 15th March 1956.
Deloro, of course, will deliver any of this cobalt metal to the United States at the price set in Contract GS-OOP-98, if requested in writing by the United States to do so in advance of the above dates for the commercial sale. Should the United States delay its written request to Deloro beyond the above dates, the risk will be on the United States that Deloro may have disposed of the cobalt on the commercial market, and, therefore, be no longer able to make delivery to the United States.
On March 16,1956, GSA wired its disagreement to Deloro and reiterated its warning not to dispose of cobalt metal to be recovered from concentrates held by Deloro under Contract 98. At this time it was Mr. Creekmore’s belief from Deloro’s letter of February 20 that the balance of the original SMAG concentrates acquired for processing under Contract 98 were *543 physically present in Deloro’s “yard.” According to the records presented by Deloro, however, the exact concentrates shipped by SMAG in 1950-1952 were no longer in existence bnt had been consumed or placed in process by December 31, 1954. Deloro’s records were not designed to identify and preserve any particular concentrates, but Mr. Scott insisted that, at all relevant times, Deloro maintained a sufficient backlog or reserve of Moroccan concentrates in its stockpile to meet its obligations under Contract 98.
37. The Comptroller General’s decision No. B-126871 was issued to GSA on March 28, 1956. It advised that GSA’s position in the Contract 98 dispute was correct because under such contracts a contractor has no right to increase the cost of supplies to the Government by his own failure or refusal to deliver by the time he promised. On April 9, 1956, GSA sent Deloro a copy of this decision and reaffirmed its position.
38. On May 3,1956; the parties again conferred, and GSA-EPS representatives sought assurances from Deloro that it would refrain from commercial sales of the cobalt metal remaining to be produced under Contract 98. It was agreed at this meeting that GSA would present the matter to the Department of Justice for review, and in turn Mr. Scott for Deloro agreed to refrain from any commercial sales on condition that final administrative action would not be unduly delayed. On May 9, Deloro was advised by the Chief of the Government Claims Section of the Department of Justice that the settlement of the issues in dispute would be taken under active study in that section. In June, September, and October 1956 Deloro was further advised that the Section’s study was awaiting receipt of information requested from GSA. Having heard nothing further by late 1956, Deloro’s management proceeded, without further notice to defendant, to take over the remaining cobalt metal under Contract 98 for its own account by instructing the General Manager to make no further deliveries under that contract. Throughout all the above described negotiations, defendant’s representatives had requested Deloro to deliver, on defendant’s pricing theory, the remaining 194,088 pounds of metal and attempt to resolve the pricing dispute thereafter. Deloro consistently refused this request.
*544 39. On August 19, 1958, the United States instituted suit against Deloro in the Supreme Court of Ontario, seeking damages for breach of Contract 98 in the sum of $129,356.51, plus interest, and for an additional $19,112.18, plus interest, for money paid under mistake. Deloro filed its petition herein on February 25, 1959, and promptly moved the Supreme Court of Ontario to stay further action there. By consent of the parties, that Court on April 1, 1959, stayed its proceedings until final disposition of this action by the United States Court of Claims.
40. With respect to Deloro’s claims for damages, the parties have partially stipulated, as follows:
(a) The total amount paid Deloro by defendant under Contract 98 is $2,621,432.47.
(b) If Deloro’s interpretation of Contract 98 as to the proper date for price computation is correct as a matter of law, Deloro is entitled to an additional payment for cobalt metal delivered under the contract in the amount of $100,564.76.
(c) On the other hand, if defendant’s interpretation of the contract in the above respect is correct as a matter of law, the amount properly payable to Deloro for cobalt metal delivered was $2,600,603.13, and accordingly, defendant is entitled to recover $20,829.34 on its counterclaim, referred to below.
(d) For the period from approximately November 1, 1956, through May 22, 1958, Deloro received moneys from the commercial sale of cobalt products to private concerns in the aggregate amount of $395,790.22.[34] None of Deloro’s account records which were produced for examination by defendant reflected (1) that any of the aforementioned sales related to cobalt produced from concentrates acquired under Contract GrS-OOP-98, (2) that any of said sales were of products held for any period of time for delivery to the defendant under said contract, or (3) that any of said sales were concurrently assigned to or are otherwise connected with said contract or any alleged breach thereof by the defendant.
*545 41. In addition to the $100,564.76 claimed by Deloro to be due on delivered cobalt metal (which figure has been stipulated if Deloro’s interpretation of Contract 98 is correct), Deloro claims the sum of $42,132.47 attributable to the undelivered cobalt metal aggregating 194,088 pounds. This figure is the difference between what Deloro would have received from defendant for the undelivered metal if priced under Deloro’s theory ($437,922.69) and the amount of its commercial sales after November 1, 1956, stipulated to be $395,790.22. However, if damages attributable to undelivered metal are properly to be measured in the same way as the parties have measured them with respect to the delivered metal, Deloro’s damages in this regard are $34,551.55. Deloro presented no internal accounting control records showing any recorded obligation to deliver metal under Contract 98 after cessation of deliveries or whereby it would be possible to connect 98 SMAG concentrates or metal to De-loro’s commercial sales during the period November 1, 1956 to May 22, 1958.
42. Deloro further claims the sum of $18,729.26 as compensation for its approximately one-half financing for defendant’s account of the purchase of the SMAG concentrates during the period from cessation of deliveries until completion of the commercial sales in May 1958. This figure was arrived at by applying a rate of 4 percent per annum to the net amount paid by Deloro in the purchase and transportation of the concentrates, namely, $138,827.25. The record is not sufficient to sustain a finding that Deloro had this amount of capital investment tied up in SMAG concentrates during the period for which the 4 percent computation was made.
43. Deloro further claims $7,256.57 representing 5 percent interest on EPS payments alleged to have been overdue under Article 2.7 of Contract 98. See finding 19. Counsel for plaintiff has conceded that the law bars Deloro from recovering this claim for interest.
44. Defendant has filed a counterclaim herein for $129,356.51, the United States dollar equivalent of the amount paid by defendant to SMAG for a one-half interest in sufficient SMAG concentrates to yield 194,088 pounds of *548 cobalt metal after processing by Deloro. As previously found (finding 33) this 194,088 pounds of metal was never delivered to defendant, although. Deloro had received the SMAG concentrates necessary to process those pounds. In addition, defendant has counterclaimed for $20,829.34, which is the amount stipulated to be due defendant if it is correct in its interpretation of Contract 98. See finding 40(c), sufra. The aforesaid sum of $129,356.51 was paid by defendant to SMAG in French francs by use of the ECA counterpart fund account. Finding 4, sufra, and Article 1.2 of Contract 98.

*546

*547

*548 CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed. The court further concludes as a matter of law that defendant is entitled to recover on its counterclaim and judgment is entered for defendant against plaintiff in the amount of one hundred and fifty thousand one hundred and eighty-five dollars and eighty-five cents ($150,185.85).

 Plaintiff was to pay a portion of tills amount (in effect) to SMAG, so that the latter’s payment would consist of a combination of the direct payment by the defendant in French francs and of a payment by plaintiff in dollars.

 The Belgian Katanga concern, the other major producer of cobalt, was then furnishing the metal to American industry. Its plant was in Belgium.

 The case cannot be disposed of on, the ground that the defendant "waived any breach by continuing to accept the late deliveries. There is nothing in this contract overriding the normal rule that a vendee does not, merely by accepting late delivery, waive a claim properly arising out of the lateness. Williston, Contracts, 3d ed., Secs. 704, 700, 702. Acceptance of the late shipments did not alter the price term of the contract.

 Some of these payments were made after plaintiff submitted amended invoices recomputing prices on the basis of the dates of actual delivery rather than the due dates (which the original invoices had used). See footnote 5.

 There is, moreover, a weighty counterbalance to the finance office’s ultimate payments to plaintiff on the basis of the delivery dates. When plaintiff realized that it would not meet the first delivery date in the contract schedule (March 10, 1951) and sought an extension to April 10, 1951, it specifically proposed that the shipment “shall be priced in the same manner as if delivery had been made prior to April 1st, 1951” (since the escalation clause contemplated an increase in price after April 1). The Government agreed to the extension on this basis. The appropriate inference would seem to be that, at th'at time, the parties believed that the price provisions of the contract were tied to the scheduled delivery dates. In addition, it is noteworthy that for shipments from November 1951 through February 1952, Deloro itself billed defendant at the $2.10 price current before October 1, 1951 — when most of this metal had been scheduled for delivery — even though the price rose to $2.40 on October 1st. It was only later that amended invoices were filed (see footnote 4).

 In 1948 Deloro successfully processed about 300 tons of French Moroccan ores, which had a high percentage of arsenic, and these ores assayed about 10 percent in cobalt content, ünlihe the Canadian ores, however, they contained no silver but did contain some gold, united States industry efforts in the field of cobalt extraction had not met with success, although in 1950-51 investigations in this country of new chemical treatment systems showed promise.

 Public Law 521, 79th Cong., 2d Sess., approved July 23, 1946. Section 1 thereof reads as follows:
That the natural resources of the United States in certain strategic and critical materials being deficient or insufficiently developed to supply the industrial, military, and naval needs of the country for common defense, it is the policy of the Congress and the purpose and intent of this Act to provide for the acquisition and retention of stocks of these materials and to encourage the conservation and development of sources of these materials within the United States, and thereby decrease and prevent wherever possible a dangerous and costly dependence of the United States upon foreign nations for supplies of these materials in times of national emergency. 60 Stat. 596.

 Public Law 472, 80th Cong. 2d Sess., approved April 3, 1948, amended by Act of April 19,1949, P.L. 47, 81st Cong., 1st Sess.

 Cobalt material could not be exported from French territory without an export license from the French Government.

 These understandings were substantially confirmed in a formal arrangement between France and the united States on October 6, 1950.

 Each party appears to contend that the other took the initiative and was the moving party in the contract negotiations. Whatever may be thought as to the relevance of such contentions, this record demonstrates that both parties were actively interested in the consummation of a suitable contract, Deloro because of its interest in profits and expanding its cobalt activity, and the defendant in acquiring cobalt metal for its stockpile.

 At the time of the negotiations, Deloro was not producing any cobalt metal, and its total actual production of cobalt in all forms was running about 5 tons per month.

 The two cent per pound of metal attributed to “Deloro financing charge” was arrived at by allowing Deloro a 4 percent per annum charge on the funds Deloro would have invested in the purchase of the ore during the interim of approximately 4 months between Deloro’s payment to ONA .and Deloro’s delivery of the metal to FSS.

 It was proposed that the Deloro-ONA purchase contract (proposed copy of which was attached) be executed after acceptance by the defendant of Deloro’s offer to sell cobalt metal to the United States. Deloro’s draft of the proposed purchase contract contained a Price Escalator Clause and a Shipments article providing for 5 shipments of concentrates by ONA starting November 1, 1950, and ending November 1,1952.

 Approval of the Munitions Board was necessary because the ultimate price to be paid was in excess of the market price and the Board was also concerned about the time for delivery.

 This belief was justified. On September 26, 1956, Deloro proposed a new provision (which was agreed to in substance) whereby the price to be paid Deloro would be adjusted in the event the Canadian dollar should advance toward parity with the united States dollar during the nearly 3-year period of the contract. This new proposal, as revised, became Article 2.14 of the contract, infra. Other than this, the material portions of the final contract were in substantial conformity with Deloro’s accepted offer, although there were numerous refinements of wording and considerable rearrangement due to the decision to combine the Deloro-ONA contract and the Deloro-United States contract into one document.

 Mr. O’Brien for Deloro and Mr. Maull for EPS (formerly ESS) had signed the document in Washington a few days earlier, after which it was forwarded to Casablanca where, on October 9, 1950, It was signed by the president of ONA for SMAG and for the united States by Mr. Henry Parkman of ECA. In letters dated October 6, 1950, the Erench Government by Mr. Robert Schuman, Minister of Eoreign Affairs, and the Government of the United States by Mr. David Bruce, its Ambassador at Paris, set forth the understanding of the Governments reached pursuant to Article V of their Economic Cooperation Agreement. These letters recited that the French Government would authorize the shipment by SMAG of 7,200 metric tons of French Moroccan cobalt concentrates which, it was understood between the two governments, the United States would stockpile as cobalt metal. Payment for the concentrates was to be made 50 percent in U.S. dollars and 50 percent in French francs from the 5 percent counterpart for American aid, the use of which was reserved to the United States under Article IV of the Agreement. The French Government also undertook to give the administrative instructions necessary to carry out the operation.

 During this period Deloro’s management was also troubled witb uncertainty as to bow extensive its expansion program should be in the light of preliminary negotiations then underway with defendant’s representatives regarding the possibility of additional contracts for cobalt production. See finding 24, infra.

 As described in finding 20, infra, Deloro later presented defendant with amended invoices correcting this discrepancy (which, Mr. Scott testified, arose from “clerical inefficiency”), by computing the escalated price based on date of shipment figures for the EMJ quotation as well as for the exchange rate.

 On March 24, 1962, Mr. Cobb had prepared and recommended the adoption of a price computation form to accompany future Deloro invoices. Following some discussion thereof and minor modifications thereto, Mr. Scott approved and directed future use of the recommended form.

 Defendant has admitted receipt on May 12, 1952, of the amended invoices with price computation sheets attached* However, counsel for defendant stated for the record herein that, despite a very diligent search, the original of Mr. Cobb’s transmittal letter could not be found in Government files. The exhibit in evidence is merely Mr. Cobb’s carbon copy taken from his Deloro file. Mr. Cobb, who testified in behalf of his client, stated that, although he had no independent recollection, it was his opinion, based on his office procedure, that the original of this letter and its listed enclosures were transmitted either by mail or by hand to Mr. Grochawsky as Certifying Officer of the Examination Branch of the Comptroller’s Office. According to a Government witness who discussed the matter with Mr. Grochawsky shortly before his death in 1959, Mr. Grochawsky had no recollection of receiving Mr, Cobb’s letter. Likewise, Mr. Grochawsky’s assistant, Mrs. J. R. Boston, who as Certifying Officer authorized payment of the amended invoices, testified that she had no independent recollection of receiving either the letter or the invoices.

 At this time Mr. Creekmore and Deloro representatives were engaged in negotiations regarding the terms of additional cobalt processing contracts. When questioned as to whether he had thought prior to 1954 that the escalated price should be computed as of the due date rather than the delivery date, he stated that the problem “just simply didn’t occur to me.”

 The cobalt metal prepared for shipment in August failed to meet contract specifications and therefore was not shipped.

 As an example, at September 10, 1951, Deloro bad delivered only 116,700 pounds of the required minimum of 280,000 so it "was confronted with a deficit of 163,300 pounds to make up in addition to the 40,000 pounds accumulating monthly. However, by letter dated September 10, 1951, Mr. Scott represented to BPS that Deloro was prepared to refine 20,000 pounds of subgrade cobalt metal and 9-,427 short tons of Canadian and Moroccan cobalt ores and Burma speiss, and to start deliveries at a rate of not less than 10 short tons per month commencing April 1, 1952, with completion in 5 years. The letter stated that this delivery time was made in relation to deliveries being made on Contract 98, “and will permit us to catch up on the amounts due thereunder before commencing the new contract.” Also, by letter to Mr. Creekmore dated October 22, 1951, Mr. Cobb estimated “in the light of Deloro’s present expectations” an increased production capacity which would have been more than sufficient for Deloro to complete Contract 98 on time.

 In another connection Deloro had written the Contracting Officer on October 6,1952, with reference to Contract 98 that its supply of untreated concentrates was greater than Deloro could treat until May, 1953. The letter, however, dealt mostly with the October strike as a result of which Deloro requested a diversion of the last Contract 98 SMAG shipment to the Belgian processor. On October 9, Deloro wired the Contracting Officer to cease all consideration of the matter.

 Mr. Scott testified that his assertion of 85 tons capacity was not intended to convey the impression of existing production in that amount. He stated that “the equipment to get to that point was installed, and coming into operation, but it didn’t function as it was expected.”

 Starting in January 1953, Deloro also began deliveries under Contract 2800 and continued thereafter in substantial accord with the delivery schedule. However, deliveries under Contract 3653 were not begun until April 1954, although they were due to commence a year earlier.

 Lot 20 was withdrawn by Deloro after an informal rejection. Lot 21 was rejected and later replaced by Lot 24.

 No definitive evidence was offered regarding the capacity of Katanga, which was producing 80 to 90 percent of the world’s cobalt metal, to have taken over this contract. That it had the ability to process arsenic ores of the SMAG types at the Katanga plant in Belgium is evidenced by the award to its subsidiary by defendant in the fall of 1952 of a contract for processing SMAG concentrates, a contract which Deloro made strenuous efforts to obtain. See finding 25, supra. Also, on June 24, 3953, Commissioner Walsh, in a letter prepared by Mr. Creekmore, referred to competition for these cobalt processing contracts. Finding 29, supra.

 The ruling of the General Accounting Office referred to was contained in three decisions of the Comptroller General numbered respectively B — 95061, dated June 22, 1950', B — 105425, dated November 16, 1951, and B — 105694, dated November 16, 1951.

 At the trial Mr. Scott testified that nearly one-half (or 100,000 pounds) of Lots 34, 35, and 36 comprised Katanga cobalt metal which Deloro had obtained from Katanga in exchange for SMAG concentrates and which Deloro had offered to EPS for processing under Contract 3653 but which EPS had declined. EPS had not been advised of this substitution and did not authorize it, but the Katanga metal fully met Contract 98 specifications. Also, in March 1954, Deloro made its first delivery of cobalt metal in the amount of 30,000 pounds to the Canadian Government under the contract with that Government referred to in finding 23, supra.

 This finding Is derived from testimony, and not from the records themselves, which were not produced at the trial. Deloro declined to bring the bulk of its accounting records to the united States, and defendant declined to send its auditors to Deloro in Canada.

 On April 7, 1954, Deloro requested shipping instructions for 60,000 pounds of metal under Contract 3653. On April 9, Mr. Creekmore advised that the shipment should be accepted, even though delinquent, because the material was Government property. Later, in April 1955, Contract 3653 was amended reducing the total cobalt involved but increasing the monthly delivery rate and extending the period of performance. The amendment further provided that if the parties were successful in settling their dispute on Contract 98, there would be a further time extension granted under Contract 3653.

 In its petition, Deloro had originally claimed these receipts had amounted to only $355,113.60, but defendant’s audit of available records increased tne amount to $395,790.22. The sales used were all Deloro’s sales in the commercial market of cobalt products commencing November 1, 1956, and continuing consecutively thereafter until the cobalt element equivalent of 194,088 pounds of cobalt metal meeting stockpile requirements had been sold.